# LAWRENCE JOHNSON *v.* STATE OF MARYLAND

[Nos. 9 and 22, September Term, 1981.]

*Decided January 7, 1982.*

406

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*George E. Burns, Jr., Assistant Public Defender,* with whom were *Alan H. Murrell, Public Defender,* and *Gary S. Offutt, Assistant Public Defender,* on the brief, for appellant.

*Deborah K. Handel* and *Stephen B. Caplis, Assistant Attorneys General,* with whom was *Stephen H. Sachs, Attorney General,* on the brief, for appellee.

DIGGES, J., delivered the opinion of the Court. ELDRIDGE, COLE and DAVIDSON, JJ., dissent. ELDRIDGE, J., filed a dissenting opinion at page 444 *infra,* in which COLE and DAVIDSON, JJ., concur. COLE, J., filed a dissenting opinion at page 456 *infra,* in which ELDRIDGE and DAVIDSON, JJ., concur.

Lawrence Johnson was convicted, after removal of this criminal cause from Baltimore County, by a jury in the Circuit Court for Calvert County of first degree murder (both premeditated and in the commission of a felony), first degree rape, kidnapping, and use of a handgun during the commission of a felony or a crime of violence. The same jury subsequently sentenced Johnson to death for the murder.[1] As is specified by the statute authorizing the sentence of death, we must, by this expedited appeal, scrutinize both the decision to execute the defendant as well as any claims of error properly presented by the parties. With the exception of the imposition of the death penalty, we sustain these convictions and sentences ordered, and remand this cause for a new hearing concerning the punishment to be given for the murder.

---

1. Md. Code (1957, 1976 Repl. Vol., 1981 Cum. Supp.), Art. 27, §§ 413, 414. In addition, the trial judge sentenced Johnson to consecutive terms of life in prison for the rape, 20 years for the kidnapping, and 15 years for the handgun offense.

The sordid chronicle of this crime spree was related by the appellant, Lawrence Johnson, at trial. It began on the early morning of February 23, 1980, when he was suddenly awakened by a friend, Amos Batts, while perched on the couch at the home of his cousin, Dwayne Mayers. At the urging of Batts, Johnson followed his friend outside to a car being operated by the cousin. It soon became apparent to Johnson that Mayers and Batts had stolen the vehicle during the night and had abducted its owner, Betty Toulson, in the process. Although Johnson had earlier declined to participate when the other two decided to obtain some money through crime, the defendant this time joined them in the car with the victim. After a brief discussion, Mayers started the vehicle and drove around while the three men smoked "parsley flakes sprayed with some kind of embalming fluid." The victim remained silent throughout this journey "with her head down." Later, after driving to a remote area of Baltimore County, Mayers stopped the car and asked whether his companions "wanted to have sex" with their prisoner. Mayers and the appellant eventually raped the woman on the back seat of her car. The trio then drove the victim to another location nearby where Mayers stripped Ms. Toulson of her coat and pocketbook. After discussing the problem presented by the victim's knowledge of their identities, Mayers returned to the automobile, removed a pistol from under the seat, and presented it to appellant with instructions to kill the woman. Johnson led her into the woods and complied with the directive. Ms. Toulson's snow-covered body was recovered five days later; she had received fatal shots in the head and chest.

Following his trial, convictions, and sentencing, Johnson, because he received the death penalty, appealed directly to this Court, Art. 27, § 414, where he presents numerous contentions concerning the conduct of trial on the issue of guilt as well as the murder sentencing proceeding. We discuss in Part I below each of seven claimed errors relating to the guilt determining phase of the trial, and in Part II focus on the three issues relating to the subsequent sentencing

hearing resulting in imposition of the death penalty by the jury.

## I. The Convictions

### a.

Johnson initially contends that, following entry of his plea of not guilty by reason of insanity and his referral to a state hospital for a psychiatric examination, he was further entitled to appointment of a private psychiatrist of his own choosing at state expense to assist in his defense. The record reveals that, upon the filing of this plea, Judge Haile in the Circuit Court for Baltimore County ordered that Johnson be transferred to the Clifton T. Perkins state mental hospital for an evaluation. After a staff examination, the hospital issued the following report, over the signatures of its superintendent and clinical director:

> Mr. Johnson was admitted to the Clifton T. Perkins Hospital Center on June 16, 1980, and evaluated in accordance with your order of April 23, 1980.
>
> On June 19, 1980, Mr. Johnson was interviewed at a medical staff conference, where results of the multidisciplinary evaluation were examined. . . .
>
> It was the opinion of the psychiatrists present at the conference that:
>
> 1. The diagnosis is Antisocial Personality; Drug Abuse by History. (majority)
> 2. At the present time, Mr. Johnson is able to understand the nature and object of the proceedings against him and to assist in his own defense. (majority)
> 3. At the time of the alleged offense, Mr. Johnson was not suffering from a mental disorder which caused him to lack substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. (majority)

> Therefore, we are making arrangements to return Mr. Johnson to your custody.

The notation "majority" following each statement in the report resulted because Dr. Clermont, the clinical director of Perkins, declined to join, stating that he "did not arrive [at] a definite conclusion about diagnosis and responsibility as the defendant was uncooperative with him during most of the interview."

Sometime later, Johnson's attorney, arguing that it was "crucial to the defense . . . that the defendant be evaluated by a privately retained psychiatrist in order to determine whether he was, in fact, sane at the time of the commission of the alleged crime," petitioned the court to appoint a private "independent psychiatrist" to further examine Johnson at the expense of the State.[2] The trial judge (Bowen, J.) denied Johnson's petition after noting that he had already been examined by the staff at Perkins hospital and that "the doctors practicing in the various institutions under the jurisdiction of the Department of Health and Mental Hygiene are 'independent psychiatrists' within the context in which that term is used in this case."

When, just before trial began, appellant orally renewed his motion for appointment of an additional psychiatrist and it was again denied, there was an indication that Johnson's attorney wished to withdraw the insanity plea "after making certain statements to the court." The following colloquy between counsel and Judge Bowen then took place:

> [Defense Counsel]: Your Honor, basically we have been unable to secure the services of the psychiatrist to evaluate Mr. Johnson, the defendant, and therefore, we have no other psychiatric testimony other than the reports from Perkins.

---

2. At all times during trial, the defendant was represented by private counsel paid by his parents. Johnson's family was apparently either unwilling or unable to expend additional sums on his behalf beyond those already paid to counsel. Although the State here disputes appellant's claim of indigency, no such contention was made before the trial court. On appeal, Johnson's claims are pressed by the public defender. We shall assume for purposes of our discussion that the defendant is, indeed, indigent.

* * *

[The Court]: It is my understanding that he was examined by the staff at Clifton T. Perkins Hospital Center and that they have an opinion as to his mental condition?

[Defense Counsel]: That's correct, your Honor. They found him competent to stand trial and competent at the time of the offense.

[The Court]: Very well. And do you have other evidence —

[Defense Counsel]: We have no other evidence we could present.

[The Court]: Very well, we will permit you to withdraw the motion. We think that there is no evidence of the plea, if you wish to do so.

[Defense Counsel]: Yes, your Honor. We would.

Appellant now asserts that this refusal of his request for appointment of a private psychiatrist effectively denied him the rights to the assistance of counsel, due process of law, and the equal protection of law in violation of various State and Federal Constitutional guarantees.[3] In making this argument, Johnson acknowledges that the judge before whom an accused has entered a plea of insanity has "full power and authority to order an examination of the mental condition of such person by the Department of Health and Mental Hygiene. . . ." Md. Code (1957, 1979 Repl. Vol., 1981 Cum. Supp.), Art. 59, § 25 (b). Johnson also admits that "the

---

3. To this, the State replies that such appointment is not required, but in any event, by withdrawing his plea of insanity before trial, Johnson has waived any claim of error based on the refusal by the trial court to authorize an additional psychiatric evaluation of the accused. As we here determine that the lower court's refusal to authorize an additional psychiatric evaluation was not error, we shall assume without deciding that appellant's claim is properly preserved for review. We note, however, that, while "ordinarily" we will not consider questions not properly preserved for appeal pursuant to Maryland Rule 885, in a previous death penalty case we demonstrated a less strict application of this principle and exercised our discretion to consider and determine questions briefed and argued before us whether or not properly preserved for review. See Bartholomey v. State, 260 Md. 504, 513, 273 A.2d 164, 169 (1971).

Department is an impartial expert," but he goes further and asserts that, in addition to such neutral evaluation, an indigent accused is entitled to another psychiatric expert, this one of his own choosing, funded by the State, solely to assist with the defense.

Although there can be little doubt that an effective defense may sometimes require expert assistance,[4] the issue as posed by appellant is a much narrower one. It solely concerns whether Maryland's statutory scheme providing for court appointment of a psychiatrist from the Department of Health and Mental Hygiene in cases involving a criminal defendant's asserted insanity or incompetency is inadequate and that the appointment of additional experts is constitutionally required.

Even though appellant doesn't specifically claim a right to a "psychiatric advocate," his position reduces to essentially that proposition; thus the words of Chief Justice Burger, speaking as a judge for the District of Columbia Circuit in *Proctor v. Harris,* 413 F.2d 383, 386 (D.C. Cir. 1969), are particularly apropos here.

---

**4.** The only United States Supreme Court decision directly on this point is United States v. Baldi, 344 U.S. 561, 73 S. Ct. 391, 97 L.Ed. 549 (1953), where the Court noted that "[w]e cannot say that the State has [the duty to appoint a psychiatrist to make a pretrial examination] by constitutional mandate." 344 U.S. at 568. The constitutional issue, however, was reawakened with the subsequent decision of Gideon v. Wainwright, 372 U.S. 335, 83 S. Ct. 792, 9 L.Ed.2d 799 (1963), which held that one of the fundamental rights applied to the states through the Fourteenth Amendment is the Sixth Amendment right to counsel. Some courts view the right secured in *Gideon* as additionally requiring the assistance of experts or investigators when necessary to provide an indigent with the effective assistance of counsel. *E.g.,* Mason v. State of Arizona, 504 F.2d 1345, 1351 (9th Cir. 1974) *cert. denied,* 95 S. Ct. 1145 (1975); Hintz v. Beto, 379 F.2d 937 (5th Cir. 1967); Jacobs v. United States, 350 F.2d 571 (4th Cir. 1965); People v. Worthy, 109 Cal.App.3d 514, 167 Cal. Rptr. 402 (1980); People v. Watson, 36 Ill.2d 228, 221 N.E.2d 645 (1966); State v. Second Jud. Dist. Ct. in and for Co. of Washoe, 453 P.2d 421 (Nev. 1969). Other courts, however, hold the view that the Constitution does not create any right to such expert assistance. *E.g.,* Watson v. Patterson, 358 F.2d 297 (10th Cir. 1966), *cert. denied,* 385 U.S. 876 (1966); Corbett v. Patterson, 272 F. Supp. 602 (D. Colo. 1967); State v. Chambers, 104 Ariz. 247, 451 P.2d 27 (1969); Taylor v. State, 229. Ga. 536, 192 S.E.2d 249 (1972); Bimbow v. State, 315 N.E.2d 738, 743-44 (Ind. App. 1974); Utsler v. State, 171 N.W.2d 739 (S.D. 1969); Foster v. Commonwealth, 209 Va. 297, 163 S.E.2d 565 (1968).

From Appellant's posture, no psychiatrist can really "assist" him adequately unless he agrees with Appellant's position. Stripped of its verbiage Appellant's position is that he is entitled to a psychiatrist sufficiently sympathetic so that he will assist counsel in preparing his case favorably to his claims, and, accordingly, in structuring cross-examination of the hospital doctors so as to neutralize their testimony.

Common sense dictates that there be some limit placed upon the right of indigents to the assistance of State-funded experts. This is not a case where the government has refused to provide psychiatric evaluation of a criminal accused who wishes to interpose an insanity defense, or where the resulting report is withheld from the defendant. Nor has appellant in this case produced evidence challenging the professional competence or impartiality of the psychiatrists at the Perkins Hospital.[5] The doctors designated by the Department of Health and Mental Hygiene to examine Johnson are thus "not partisans of the prosecution, though their fee is paid by the State, any more than is assigned counsel for the defense beholden to the prosecution merely because he is . . . compensated by the State. Each is given a purely professional job to do — counsel to represent the defendant to the best of his ability, the designated psychiatrists impartially to examine into and report upon the mental condition of the accused." *McGarty v. O'Brien,* 188 F.2d 151, 155 (1st Cir. 1951), *cert. denied,* 341 U.S. 928 (1951).

We are sensitive to the concerns of the defense attorney in this case faced with the task of undertaking to defend one who had voluntarily confessed to the crime in grim detail

---

5. Defendant's complaints about the facial brevity of the report in no way impugn the integrity of the evaluation contained in it. Appended to the report was a summary of staff deliberations on the competence of Johnson. Moreover, Dr. Ernest Kamm, a clinical psychologist at Perkins, filed a separate psychological report, portions of which the defendant used at trial along with the testimony of Dr. Kamm.

and where the state possessed overwhelming evidence of his client's participation in the criminal acts. Counsel indeed confronted a bleak prospect unless he could develop sufficient evidence of insanity to at least create a jury question. Certainly, in these circumstances the indigent accused is at a disadvantage when compared with the wealthy defendant who possesses unlimited resources for the marshalling of batteries of attorneys, investigators and experts. It cannot be seriously contended, however, that the State must precisely equalize the position of the penurious defendant and the wealthy one. Even in the case of a right to counsel, an indigent accused is neither entitled to several attorneys to represent him nor to select a particular attorney to be appointed. *Campbell v. State,* 231 Md. 21, 188 A.2d 282 (1963); see Annot. 66 A.L.R.3d 996. Here, Johnson was evaluated by a team of independent psychiatric experts, he was furnished with copies of the resulting reports prepared by the examiners, and he had the opportunity to subpoena and question at trial members of the examining team. Whatever the amount of required State assistance for the appointment of defense experts to enable the indigent to place the issue of insanity before the trial court, we need not determine here, for it is certain that once an accused is evaluated by state funded, impartial and competent psychiatrists, that constitutional duty, if any, ends. "[T]he State has no constitutional obligation to promote a battle between psychiatric experts 'by supplying defense counsel with funds wherewith to hunt around for other experts who may be willing, as witnesses for the defense, to offer the opinion that the accused is criminally insane' . . . ." *Swanson v. State,* 9 Md. App. 594, 601-02, 267 A.2d 270, 274 (1970) (Murphy, C.J.). We have found no case which broadens constitutional principles this far and defendant has cited none. Where an indigent accused has already received a competent psychiatric evaluation at state expense, either by the staff of a state institution, or by a private physician selected by the court, the cases throughout the country are in virtual unanimity and agree with our position upholding the denial of the indi-

gent's request for an additional psychiatric expert of his own choosing compensated by the state. *E.g., United States v. Baldi,* 344 U.S. 561, 568, 73 S. Ct. 391, 395, 97 L.Ed. 549 (1953); *Satterfield v. Zahradnick,* 572 F.2d 443, 445 (4th Cir. 1978), *cert. denied,* 436 U.S. 920 (*but see Williams v. Martin,* 618 F.2d 1021 (4th Cir. 1980)); *Proctor v. Harris,* 413 F.2d 383 (D.C. Cir. 1969); *McGarty v. O'Brien,* 188 F.2d 151, 155-57 (1st Cir. 1951), *cert. denied,* 341 U.S. 928, 71 S. Ct. 794 (1951); *Wilkins v. State of Maryland,* 402 F. Supp. 76, 80-81 (D. Md. 1975); *Campbell v. Superintendent, Virginia State Pen.,* 386 F. Supp. 778, 779 (W.D. Va. 1974); *Utsler v. Erickson,* 315 F. Supp. 480, 482-83 (D. S.D., 1970); *State v. Crose,* 88 Ariz. 389, 357 P.2d 136 (1960); *Barber v. State,* 248 Ark. 64, 450 S.W.2d 291, 294 (1970); *Dampier v. State,* 245 Ga. 427, 265 S.E.2d 565, 571 (1980); *State v. Dillon,* 93 Idaho 698, 471 P.2d 553, 560 (1970), *cert. denied,* 401 U.S. 942 (1970); *Bimbow v. State,* 315 N.E.2d 738, 743-44 (Ind. App. 1974); *State v. Burnett,* 222 Kan. 162, 563 P.2d 451, 453-55 (1977); *State v. Square,* 257 La. 743, 244 So.2d 200, 209 (1971); *Commonwealth v. Medeiros,* 354 Mass. 193, 236 N.E.2d 642, 646, *cert. denied,* 393 U.S. 1058 (1969); *State v. Grant,* 560 S.W.2d 384 (Mo. App. 1977); *State v. Osborne,* 119 N.H. 427, 402 A.2d 493, 496-97 (1979); *State v. Patterson,* 288 N.C. 553, 220 S.E.2d 600, 612-13 (1975); *State v. Downs,* 51 Ohio St. 2d 47, 364 N.E.2d 1140, 1149 (1977); *State v. Glover,* 33 Or. App. 553, 577 P.2d 91, 93 (1978); *Utsler v. State,* 84 S.D. 360, 171 N.W.2d 739, 742 (1969); *Graham v. State,* 547 S.W.2d 531 (Tenn. 1977); *Hammett v. State,* 578 S.W.2d 699, 707 (Tex. Crim. App. 1979) (en banc); *Mason v. Commonwealth,* 219 Va. 1091, 254 S.E.2d 116, 119 (1979), *cert. denied,* 444 U.S. 919 (1979). The decisions of our Court of Special Appeals on this issue are also in accord with the foregoing. *Gaither v. State,* 13 Md. App. 245, 282 A.2d 535 (1971); *Swanson v. State,* 9 Md. App. 594, 267 A.2d 270 (1970). Concerning this issue generally see "Right of Indigent Defendant in Criminal Case to Aid of State by Appointment of Investigator or Expert," Annot. 34 A.L.R.3d 1256.

b.

Johnson next asserts that the trial court erred in not admitting certain psychological evidence at trial where he sought to use this information, not to establish his legal insanity, but rather, to demonstrate that he lacked a sufficient mental capacity to form the requisite intent to commit murder in the first degree. As an aid to an understanding of this issue we set out its factual predicate.

At trial, the defense called Dr. Ernest Kamm, a clinical psychologist at the Clifton T. Perkins Hospital Center. Dr. Kamm had conducted a psychological examination of Johnson as part of the court ordered evaluation performed by the Perkins staff and had prepared a report of his findings. Counsel for Johnson proffered that he wished to use Dr. Kamm's entire report and testimony "to go to the mitigation of First Degree Murder and any specific [intent] crimes," rather than to raise the issue of defendant's sanity. The court allowed the psychologist to read to the jury only parts of his report relating to intelligence tests he had administered to Johnson and his conclusion, based on those tests, that the defendant "functions at the borderline intellectual level (I.Q. 72) . . ." [6] Appellant urges that the entire report is relevant

---

**6.** We reproduce here in full Dr. Kamm's psychological report with emphasis indicating the portions read to the jury:

TESTS ADMINISTERED:
  WAIS
  Bender-Gestalt
  Holtsman Inkblot Technique
  Color Pyramid Test
TEST BEHAVIOR:
  The patient is a 19-year old youth of medium height and build who presented a neat and clean appearance. He was extremely sullen and hostile, and his cooperation for interview and test was poor. In view of this test results have to be considered tentative.
TEST RESULTS:
  *On the WAIS he earned a Verbal I.Q. of 78, a Performance I.Q. of 68, and a Full Scale I.Q. of 72 which places him within the borderline range of intelligence.* His potential, as gauged by his abstract reasoning, is at least within the low average range. Intellectual efficiency is decreased by a combination of educational deprivation and negativism. There are some signs which point in the direction of bizarre thinking and a tenuous hold on reality. E.G.

to his defense of "diminished capacity" — that is, he did not have sufficient mental capacity to form the requisite specific intent to commit some of the crimes with which he is charged. Consequently, the argument goes, it was error to keep that information from the jury when it determines the guilt issue. In order to decide whether this ruling on the evidence was erroneous, however, we must first examine whether the criminal defense known as "diminished capacity," or as it is sometimes called, "diminished responsibility," is recognized in this State. Only if such a doctrine exists in our jurisprudence is defendant arguably entitled to produce evidence in support of it. Because we here determine, however, that this State does not recognize diminished capacity as a legal doctrine operating to negate specific criminal intent, it was not error to exclude evidence in support of it.

Before expounding on why the principle of diminished capacity has been rejected in Maryland as a criminal defense

---

on Card 22 of the Holtzman he saw "the devil," and on Card 27 he saw "God over water." But these should be interpreted with caution, as they may also be attempts to embarrass and express contempt for the examiner by giving nonsensical answers.

The personality picture is that of an extremely deprived individual who does not expect any affection and emotional support from either parental figure. He perceives the mother figure as domineering, but distant and devoid of warmth and understanding and the father figure as hostile and threatening. Yet he has conjured up the image of an idealized, all wise and all loving father surrogate with whom he will compare any male elder. Since such a person is bound to fall short of his ideal he is apt to equate this person with the real father figure whom he sees in negative terms and reject him. As a result he not only has trouble with authority figures, but perceives the world about him as a cold inhospitable place where he does not have a chance.

CONCLUSION:

*The patient functions at the borderline intellectual level (I.Q. 72), but his potential is at least within the low average range. He can be described as a severely deprived individual with a hostile and negative orientation and an [sic.] severe authority problem.* Contact with reality is difficult to evaluate on account of his poor productivity resulting from extreme negativism.

We note that Md. Code (1974, 1980 Repl. Vol., 1981 Cum. Supp.), § 9-120 of the Courts Article provides that a psychologist, duly licensed and qualified as an expert witness, "may testify on ultimate issues, including insanity, competency to stand trial, and matters within the scope of that psychologist's special knowledge...."

relevant to the issue of guilt, see *Armstead v. State,* 227 Md. 73, 175 A.2d 24 (1961); *Allen v. State,* 230 Md. 533, 188 A.2d 159 (1963), and why we adhere to that position now, it may prove helpful to explore briefly our understanding of the doctrine and its background. The basic outline of diminished capacity has been summarized as follows:

> [S]ince certain crimes, by definition, require the existence of a specific intent, any evidence relevant to the existence of that intent, including evidence of an abnormal mental condition not constituting legal insanity, is competent for the purpose of [negating] that intent. . . . [T]he actual purpose of such evidence is to establish, by negating the requisite intent for a higher degree of offense, that in fact a lesser degree of the offense was committed. [Annot. 22 A.L.R. 3d 1228, 1238 (1969).]

Thus, only after a defendant has been determined to be criminally accountable for his actions (legally sane) has the doctrine been applied to admit expert testimony as to a defendant's mental condition in order to determine the degree of criminality for which the accused will be held responsible. See *McCarthy v. State,* 372 A.2d 180, 182 (Del. 1977); *State v. DiPaolo,* 34 N.J. 279, 168 A.2d 401, 409-10 (1961); Annot., 22 A.L.R. 3d 1228.

The states are less than unanimous in their resolution of the question whether application of diminished capacity to criminal trials on the issue of guilt represents a legally sound resolution of the pressing problem of how the criminal law should treat evidence of mental abnormality that does not establish the actor's legal insanity. *Compare, e.g., United States v. Brawner,* 471 F.2d 969 (D.C. Cir. 1972) (en banc) (expert testimony admissible to demonstrate diminished capacity) *with Bethea v. United States,* 365 A.2d 64, 83-92 (D.C. App. 1976), *cert. denied,* 433 U.S. 911 (1977) (rejection of diminished capacity doctrine).[7] It is generally

---

**7.** For a chronicling of those jurisdictions which have adopted the diminished capacity defense, either by judicial fiat or through legislative action, and a listing of those which have rejected the doctrine, see Pfeiffer v. State,

recognized, however, that adoption of the concept of diminished capacity as a separate defense involves "a fundamental change in the common law theory of [criminal] responsibility," *Fisher v. United States,* 328 U.S. 463, 476, 66 S. Ct. 1318, 1325, 90 L.Ed. 1382 (1946). This is true because the introduction of expert psychiatric testimony concerning the defendant's mental aberrations when the basic sanity of the accused is not at issue conflicts with the governing principle of the criminal law that all legally sane individuals are equally capable of forming and possessing the same types and degrees of intent. *Bethea v. United States,* 365 A.2d 64, 87 (D.C. App. 1976), *cert. denied,* 433 U.S. 911 (1977); *see Cole v. State,* 212 Md. 55, 58-59, 128 A.2d 437, 439 (1957); *c.f. Bradford v. State,* 234 Md. 505, 509, 200 A.2d 150, 152 (1964). Consequently, an individual determined to be "sane" within the traditional constructs of the criminal law is held accountable for his action, regardless of his particular disabilities, weaknesses, poverty, religious beliefs, social deprivation or educational background, *e.g., Cole v. State, supra,* 212 Md. at 58-59, 128 A.2d at 439. The most that is proper to do with such information is to weigh it during sentencing. See *Logan v. State,* 289 Md. 460, 480-81, 425 A.2d 632, 642-44 (1981). This view of the relation of diminished capacity to criminal culpability is exemplified by *Bethea v. United States, supra,* 365 A.2d at 88 where the court, quoting Judge Leventhal concurring in *United States v. Moore,* 486 F.2d 1139, 1179-80 (D.C. Cir. 1973) (en banc), *cert. denied,* 414 U.S. 980 (1973), noted that:

> [t]he legal conception of criminal capacity cannot be limited to those of unusual endowment or even average powers. A few may be recognized as so far from normal as to be entirely beyond the reach of criminal justice, but in general the criminal law is a means of social control that must be potentially capable of reaching the vast bulk of the population.

44 Md. App. 49, 57-58 n.4, 407 A.2d 354, 358-59 (1979). To this compendium, we add the recent case of Steele v. State, 97 Wis.2d 72, 294 N.W.2d 2 (1980), which rejects the doctrine.

> Criminal responsibility is a concept that not only extends to the bulk of those below the median line of responsibility, but specifically extends to those who have a realistic problem of substantial impairment and lack of capacity. ... The criminal law cannot "vary legal norms with the individual's capacity to meet the standards they prescribe, absent a disability that is both gross and verifiable, such as the mental disease or defect that may establish irresponsibility. The most that it is feasible to do with lesser disabilities is to accord them proper weight in sentencing."

A review of our prior decisions in this area as they interact with legislative enactments on the subject demonstrates that this State has consistently adhered to the just articulated view that the criminal law as an instrument of social control cannot allow a legally sane defendant's lesser disabilities to be part of the guilt determining calculus. For the purpose of guilt determination, an offender is either wholly sane or wholly insane. In 1888, this Court, following the lead of the celebrated English *McNaughten* [8] case, first enunciated the test for criminal responsibility. An accused was held to be sane and responsible for his act if "at the time of the commission of the alleged offense, he had capacity and reason sufficient to enable him to distinguish between right and wrong, and understand the nature and consequences of his act, as applied to himself. ..." *Spencer v. State,* 69 Md. 28, 37, 13 A. 809, 813 (1888). Insanity, as defined by Chief Judge Alvey for this Court in *Spencer* was an all or nothing proposition:

> [T]he law is not a medical nor a metaphysical science. Its search is after those practical rules which may be administered without inhumanity for the

---

**8.** "Daniel McNaughten was inconsistent in the spelling of his name, and courts and commentators ever since have shared that inconsistency. (see Frankfurter, Of Law and Life and Other Things (1965) p. 3)." People v. Drew, 22 Cal.3d 333, 149 Cal. Rptr. 275, 275 n.1 (1978). We follow the spelling as used in Spencer v. State, 69 Md. 28, 13 A. 809 (1888), the first Maryland case to embrace the *McNaughten* doctrine.

> security of civil society by protecting it from crime,
> and therefore it inquires not into the peculiar con-
> stitution of mind of the accused, or what weakness
> or even disorders he was afflicted with, but solely
> whether he was capable of having, and did have, a
> criminal intent. If he had such intent the law pun-
> ishes him, but if not, it holds him dispunishable.
> [*Id.* at 41, 13 A. at 814.]

Because the accused in *Spencer* did not offer to establish his insanity as thus defined, the Court declined to accept proffered testimony of the defendant to the effect that he was "nervous and restless . . . haunted with the idea, that so long as the deceased lived, [the defendant] would have no rest or peace of mind, and that he could exercise no power of will or self-control over this idea. . . ." 69 Md. at 35, 13 A. at 812. The *Spencer* court, after reviewing the facts of the homicide, rejected the further use of the proffered testimony "to show such condition of mind as to have rendered the prisoner incapable of forming the wilful and premeditated purpose of killing to constitute. . . murder in the first degree. . . ." 69 Md. at 41, 13 A. at 814, and concluded that "[t]he prisoner being criminally responsible, and having thus premeditated the killing, there is no principle that would justify the intro-duction of such evidence as that proffered for the purpose of reducing the degree of his crime." 69 Md. at 43, 13 A. at 815. In *Cole v. State,* 212 Md. 55, 128 A.2d 437 (1957), we reaffirmed our adherence to the Spencer-McNaughten doc-trine defining the conditions under which one is excused of responsibility for an otherwise criminal act. In that case, a defendant convicted of rape sought review of a trial court decision refusing to admit certain medical evidence as to his mental condition. The proffered material was rejected in the trial court because it did not tend to show legally recognized insanity under the Spencer-McNaughten right-and-wrong test. 212 Md. at 56, 128 A.2d at 438. The essence of the proffer was that the defendant had been suffering from encephalitis, an inflammation of the brain, and that various experts believed the defendant far less able to control his behavior as a result of the malady; some of the potential

expert witnesses were prepared to testify that the "crime [was] a product of the disease" 212 Md. at 57, 128 A.2d at 438. This Court in *Cole,* recognizing that any changes to the Spencer-McNaughten doctrine involved "basic and far reaching questions of public policy," declined to define insanity in terms of "a mental disease or mental defect." 212 Md. at 58, 128 A.2d at 439. Rather, our predecessors noted that "if a workable definition of some new element [of the Spencer-McNaughten rule] is to be evolved, . . . that is a prerogative of the legislature and not of the courts." *Id.* Although *Cole* dealt solely with a proposed redefinition of basic insanity sufficient to completely exculpate an accused, the words of the case proved prophetic when four years later this Court was presented, in *Armstead v. State,* 227 Md. 73, 175 A.2d 24 (1961), with the question, first raised in *Spencer,* of whether an accused may, as a matter of law, attempt to prove the existence of a lesser mental condition not amounting to insanity in order to negate specific intent so as to reduce first degree murder to murder in the second degree. The defendant in *Armstead* while recognizing that the testimony showing her epilepsy and susceptibility to grand mal seizures did not show her to be insane, nevertheless argued that this evidence demonstrated "diminished responsibility" precluding guilt of first degree murder. 227 Md. at 74, 175 A.2d at 25. Reflecting in that case the Spencer-McNaughten concept of criminal responsibility, we in *Armstead* again viewed insanity as an all or nothing proposition, and noted:

> if [the accused] lacked sufficient mental capacity to commit a crime (in this instance, wilful, deliberate and premeditated murder) as required by the standard set in *Spencer,* she would be entitled to a general verdict of not guilty by reason of insanity, but, on the other hand, if she did have sufficient mental capacity to create criminal responsibility as the test was set forth in *Spencer,* then she is a responsible agent and must answer for the crime she committed, unless . . . the *Spencer* rule is broadened or modified. [227 Md. at 76, 175 A.2d at 26.]

In *Armstead,* we declined not only to expand the common law concept of insanity so as to encompass diminished capacity but also to recognize the doctrine as an independent defense. This position was reaffirmed shortly thereafter in *Allen v. State,* 230 Md. 533, 188 A.2d 159 (1962).

Upon this common law doctrinal base, the General Assembly passed in 1967 a massive remodeling of the limits of criminal culpability as expressed in the definition of insanity. In that year, Chapter 709 of the Laws of Maryland, Md. Code (1957, 1964 Repl. Vol., 1967 Cum. Supp.), Art. 59, § 9, was enacted replacing the court established Spencer-McNaughten test for insanity with the broader rule patterned after that expressed in the American Law Institute Model Penal Code (section 4.01) admitting consideration of a "mental disease or defect." Md. Code 1957 (1964 Repl. Vol., 1967 Cum. Supp.), Art. 59, § 9 (a). The sweeping change wrought by the 1967 law in the test for insanity was further refined in 1970 by Chapter 407 of the Laws of that year where the prior test of criminal responsibility was relocated to new section 25(a) of Article 59 and the term "mental disorder" was substituted for "mental disease or defect." The section now reads:

> A defendant is not responsible for criminal conduct and shall be found insane at the time of the commission of the alleged crime if, at the time of such conduct as a result of mental disorder, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. [Md. Code (1957, 1979 Repl. Vol.), Art. 59, § 25 (a).]

Additionally, by that same enactment, mental disorder was expressly defined in section 3 (f) as "mental illness or mental retardation or any other form of behaviorial or emotional illness resulting from any psychiatric or neurological disorder." [9] By thus defining and redefining the

---

**9.** This section 3 (f) definition of mental disorder has recently been altered slightly. See discussion in text *infra;* Code (1957, 1979 Repl. Vol., 1981 Cum. Supp.), Art. 59, § 3 (f).

limits of criminal culpability as expressed in the definition of legal insanity, the General Assembly has exercised its unique prerogative to balance the interests of the community and the individual accused in this regard. *See Cole v. State, supra.* We here reaffirm our position that "the concepts of both diminished capacity and insanity involve a moral choice by the community to withhold a finding of responsibility and its consequence of punishment," *Bethea v. United States, supra,* 365 A.2d at 90, n.55, and on this basis are indistinguishable.[10] Accordingly, because the legislature, reflecting community morals, has, by its definition of criminal insanity, already determined which states of mental disorder ought to relieve one from criminal respon-

---

10. Given the primary assumption in the criminal law concerning a defendant's criminal culpability regardless of his lesser abilities, whatever they may be, and "recognizing the unique position of the concept of insanity in the framework of criminal responsibility," Bethea v. United States, 365 A.2d 64, 86 (D.C. App. 1976), we cannot agree with those courts which easily declare that evidence of a legally sane defendant's mental impairment is always probative on the factual question of whether a particular accused entertained the requisite mental state. *See, e.g.,* State v. DiPaolo, 34 N.J. 279, 168 A.2d 401 (1961), *cert. denied,* 368 U.S. 880 (1961). There is a fundamental difference between evidence demonstrating that the defendant did not *as a fact* possess the requisite mental state, here premeditation and deliberation, as opposed to evidence establishing that the defendant was *generally less capable* than a normal person of forming a requisite *mens rea.* Certainly, we recognize the basic proposition that the state must prove every element of a crime beyond a reasonable doubt, including specific intent if necessary, and that an accused is entitled to rebut the state's case. Mullaney v. Wilbur, 421 U.S. 684, 95 S. Ct. 1881, 44 L.Ed.2d 508 (1975). The doctrine of diminished capacity, in our view, however, does not operate to demonstrate that, as a fact, a defendant did not entertain a requisite mental state; rather, the principle is used to establish a legally sane but mentally impaired defendant's diminished culpability for a particular criminal act.

Moreover, facile comparison of the doctrine of diminished capacity with the rule allowing certain evidence of a defendant's intoxication on the issue of *mens rea* does not withstand scrutiny. The degree of intoxication necessary to negate *mens rea* is great and is comparable with that degree of mental incapacity that will render a defendant legally insane. As noted in State v. Gover, 267 Md. 602, 608, 298 A.2d 378, 382 (1973):

> If the trier of fact determines that at the time the alleged criminal act occurred, the accused had become so inebriated that he possessed no reason or understanding, then he has reached that stage of intoxication that renders him incapable of forming the requisite *mens rea* which is a necessary element of all specific intent crimes.

Lesser degrees of incapacity, whether produced by intoxication or organic mental impairment will not relieve a defendant of full responsibility for his acts. *See* 267 Md. at 606-07, 298 A.2d at 381.

sibility, this court is without authority to impose our views in this regard even if they differed. *See, Bates v. State,* 386 A.2d 1139, 1143 (Del. 1978); *Bethea v. United States, supra,* 365 A.2d at 92; *Steele v. State,* 97 Wis.2d 72, 294 N.W.2d 2, 13 (1980).

In light of criticism of the McNaughten insanity test, diminished capacity has been viewed as a solution to some of the inadequacies of the traditional approach to criminal responsibility, *People v. Drew,* 22 Cal.3d 333, 149 Cal. Rptr. 275, 280-81 (1978) (en banc); *People v. Henderson,* 60 Cal.2d 482, 35 Cal. Rptr. 77, 82 (1963), and many decisions allowing evidence of a sane defendant's mental abnormalities arise in jurisdictions which define criminal insanity in terms of the McNaughten principle. *E.g., State v. Gramenz,* 256 Iowa 134, 126 N.W.2d 285 (1964); *State v. DiPaolo,* 34 N.J. 279, 168 A.2d 401 (1961); *Commonwealth v. Walzack,* 468 Pa. 210, 360 A.2d 914 (1976). In fact, some assert that the judicial development of the diminished capacity defense assuaged dissatisfaction with the McNaughten test and actually inhibited reform of it. Arenella, *The Diminished Capacity and Diminished Responsibility Defenses: Two Children of a Doomed Marriage,* 77 Col.L. Rev. 827, 854-55 (1977). With the broadening of the concept of criminal insanity beyond the strictures of the Spencer-McNaughten test accomplished by section 25 (a), however, the arguable need for a doctrine such as diminished capacity to ameliorate the law governing criminal responsibility prescribed by the McNaughten rule has been eliminated to the extent the legislature has deemed it advisable to do so. *See People v. Drew, supra;* Held, *Diminished Capacity in California: A Diminished Future or Capacity for Change?,* 8 S.F.U.L. Rev. 203 (1980); Comment, *Diminished Capacity and California's New Insanity Test,* 10 Pac. L.J. 751 (1979).

That the General Assembly has exercised its prerogative to make the delicate judgments upon which changes in the limits of criminal responsibility are based, can be illustrated by its actions concerning mental retardation and the relation of that mental condition to criminal culpability. In 1972, the term "mental retardation" was deleted from the

section 3 (f) definition of "mental disorder" and the definition was made to expressly preclude mental retardation. 1972 Md. Laws, ch. 345; Md. Code (1957, 1979 Repl. Vol.), Art. 59, § 3 (f). Because at common law, mental retardation alone was not generally considered sufficient to support the defense of insanity, *State v. Deyo*, 358 S.W.2d 816, 826 (Mo. 1962); *Bradshaw v. State,* 353 So.2d 188, 191 (Fla. App. 1978); *see Commonwealth v. Mazza,* 366 Mass. 30, 313 N.E.2d 875, 878 (1974); *Perkins on Criminal Law* (2d ed. 1969) pp. 878-79, it appeared that the foregoing amendments precluded the insanity defense based on that mental condition. When, in 1978 the Attorney General of this State expressed the view that, in light of these statutory changes, "the Legislature intended that the defense of insanity based upon mental retardation would be unavailable to defendants in the future," 63 Op. Md. Att'y. Gen. 230, 235 (1978), the General Assembly, in response, redefined "mental disorder," as expressed in Code (1957, 1979 Repl. Vol., 1981 Cum. Supp.), Art. 59, § 3 (f), "[for] the purpose of including mental retardation in the definition of mental disorder" when that term is used to define insanity as a defense in criminal cases. 1980 Md. Laws, ch. 823.[11] Thus, by readjusting the concept of criminal insanity to include mentally retarded defendants, the legislature has made manifest that any such mentally deficient persons having met the section 25 (a) definition of insanity are not to be held accountable for behavior in breach of societal norms as those precepts are expressed in the criminal law. The General Assembly, however, has not expressed a similar determination that a lesser mental condition, short of insanity, however defined, will suffice to relieve the accused of the full measure of criminal responsibility by mitigating specific intent crimes, and we again decline to impose our views on this essentially legisla-

---

**11.** The 1980 changes added to the definition of "mental disorder" a proviso to the exclusion of mental retardation. The last sentence of Code (1957, 1979 Repl. Vol., 1981 Cum. Supp.), Art. 59, § 3 (f) now reads: "[t]he term [mental disorder] shall not include mental retardation except as used in §§ 23 through 28, inclusive." The referenced sections regulate insanity as a defense in criminal cases.

tive prerogative. *Cole v. State, supra; Armstead v. State, supra; Young v. State, supra.*[12]

What has just been iterated does not mean, however, that evidence of a defendant's mental abnormality which does not establish his insanity has been totally precluded from the consideration of those operating the machinery of our criminal justice system. Such evidence typically constitutes part of the range of data upon which the trial judge, following establishment of guilt, focuses attention when sentencing the individual accused. Such use of this information squares with the practice prevailing in our jurisprudence of permitting the judge wide latitude in making individualized sentencing decisions after consideration of information both in aggravation and mitigation of penalty. As we so recently noted in *Logan v. State,* 289 Md. 460, 480-81, 425 A.2d 632, 643 (1981):

> "[in] exercising the discretion vested in [the sentencing judge], the procedural policy of the State encourages him to consider information concerning the convicted person's reputation, past offenses, health, habits, mental and moral propensities, social background and any other matters that a judge ought to have before him in determining the sentence that should be imposed."

Consequently, although the diminished capacity defense has not been written into our laws defining criminal guilt, evidence of a defendant's mental abnormality which does not

---

12. We note that the legislatures of some states have enacted the diminished capacity doctrine. See Alaska Stat. § 12.45.085 (1980); Ark. Stat. Ann. § 41-602 (1947, 1979 Supp.); Colo. Rev. Stat. § 16-8-103 (1) (1973, 1980 Supp.); Haw. Rev. Stat., § 704-401 (1976 Repl. Vol., 1979 Supp.); Idaho Code § 18-208 (1) (1979, 1981 Supp.); Mo. Ann. Stat. § 552.030 (3) (1) (Vernon) (1981 Supp.); Mont. Rev. Codes Ann. § 46-14-102 (1979). Recently, the legislature of California, however, abrogated the defense of diminished capacity, see Cal. Penal Code § 28 (a) (b) (Chapter 409, S.B. 54, adopted Sept. 10, 1981), and the Delaware Legislature enacted a statute providing for recognition of diminished capacity but repealed the provision prior to the code's effective date. See 59 Del.L.Ch. 203, § 36; Bates v. State, 386 A.2d 1139, 1143 (Del. 1978).

establish his insanity can be considered at sentencing.[13] Indeed, the General Assembly has demonstrated its awareness of the moral and legal policy considerations involved in defining the limits of criminal culpability by expressly providing that, in death penalty cases such as the one we now consider, the sentencing authority, be it judge or jury, may consider the defendant's impaired mental abilities in mitigation of punishment. Article 27, Section 413 (c) specifically authorizes admission of evidence relating to any mitigating circumstance for consideration by the sentencing body. The statute provides that in mitigation of penalty, the jury or court must evaluate whether "[t]he murder was committed while the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired as a result of mental incapacity, mental disorder, emotional disturbance, or intoxication." Md. Code (1957, 1976 Repl. Vol., 1981 Cum. Supp.), Art. 27, § 413 (g) (4). Clearly, the General Assembly had commanded that in death penalty cases mental weaknesses, short of insanity, of a particular accused are to be considered, not in determining whether the defendant is to be held criminally responsible for his act, but rather, in considering the appropriate penalty to be set for the crime. Therefore, at the punishment determining stage of a death penalty case, testimony of a defendant's impaired mental abilities should be admitted and the full mental profile of the prisoner may be adduced, uninhibited by the requirements of the legal definition of insanity. It is thus at the sentencing hearing where the common experience of the judge or jury is called upon to assess the defendant's impaired mental capabilities and where this mitigating circumstance is evaluated in order to determine whether, in fairness and mercy, a defendant ought to be held less culpable for his criminal act.

---

**13.** *See* Jurek v. Texas, 428 U.S. 262, 271, 96 S. Ct. 2950, 2956, 49 L.Ed.2d 929 (1976), where the Court noted that, "in order to meet the requirement of the Eighth and Fourteenth Amendments, a capital-sentencing system must allow the sentencing authority to consider mitigating circumstances."

c.

We now consider Johnson's contention that the trial judge committed reversible error in allowing testimony which the accused characterizes as "purely prejudicial" to be adduced at trial to the effect that the victim had a very sick daughter. Assuming, solely arguendo, that this testimony was superfluous to the prosecution's case, a reversal of the underlying convictions is not justified if the evidentiary violation constitutes harmless error. The standard for determining harmless error, as thoughtfully laid out by Judge O'Donnell for this Court in *Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665, 678 (1976), is whether "a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict. . . ." Upon such a review of the trial record in this case we have no difficulty in declaring beyond a reasonable doubt that the verdicts were not influenced by the testimony concerning the daughter's health. The record is glutted with overwhelming evidence in support of the jury's guilt determinations, including the defendant's prior voluntary confession to the crimes as well as his testimonial admissions at trial. A reversal on this basis is thus not warranted.

d.

Immediately following the court's instructions to the jury at the guilt determining phase of appellant's trial, it became known that one of the panel member's father had been stricken ill and was in the hospital. After a bench conference, at which both Johnson and his attorney expressed consent, Judge Bowen excused the juror, Mr. McCamey, and replaced him with the first alternate. The proceedings continued with the court, at the request of the prosecution, briefly amending its instructions to the jury concerning first and second degree rape. Following this interlude, and before closing argument began, Mr. McCamey returned to the courtroom after checking on his father's condition during his

brief absence and expressed a desire to return to jury service. In response to this request, the judge called another bench conference with appellant, the attorneys, and the excluded juror, and returned Mr. McCamey to the panel; both counsel expressly approved of the reinstatement, although the defendant himself was this time silent on the matter. The court, for the benefit of juror McCamey, then repeated verbatim its short amendatory instruction concerning the law of rape given in his absence. Counsel then presented their closing arguments to the jury.

Johnson here asserts that the reinstatement of juror McCamey was a "patently illegal procedure" which requires reversal. This contention has no merit, for we do not agree with defendant's claim that reinstatement of a temporarily excused juror prior to deliberations can only be made affirmatively by the accused himself. It is clear that not every matter touching a defendant's right to a jury need be decided by the accused personally. As we recently held in *State v. Magwood,* for example, the right to a sequestered jury during deliberations is not so fundamental that it can only be waived by the defendant personally, and either consent of counsel to a jury separation or failure to object to the dispersal constitutes a waiver of the right. 290 Md. 615, 628, 432 A.2d 446, 453 (1981). If counsel can consent to a continuation of jury deliberations following an overnight dispersal of the entire group, he can certainly agree in the presence of the accused and without his objection to the return of one juror to service following a brief separation from the trial proceedings before deliberations have begun. All jury deliberations occurred with the same panel that was originally selected and defendant does not attempt to demonstrate that he was in any way prejudiced by juror McCamey's brief absence from the courtroom. Consequently the trial judge committed no error in exercising his discretion to reinstate juror McCamey to the panel with the express consent of Johnson's counsel.

e.

Appellant, in an effort to explain the effects of the drugs

he was ingesting while riding in the victim's car, secured Mr. Gordon Glazer, "an employee of the Center dealing with the problem of abusive substances . . .," to testify on his behalf. Defendant did not subpoena Mr. Glazer, however, and the witness was not present on the second day of trial when defendant sought his testimony. Responding to a search for the witness instituted by the trial judge, Mr. Glazer's office contacted the court with information that he had left for Alaska and that attempts were being made to stop him at the airport or to hold his plane. The judge declared that such action would not be necessary and Mr. Glazer did not appear. In an effort to provide the defense with a witness who could testify on the subject of Mr. Glazer's proposed testimony, however, the trial judge informed counsel that Dr. Spodak, "an independent medical employee of the State of Maryland" was present "and had substantially better credentials for testifying . . . than did Mr. Glazer." Dr. Spodak was present in order to testify in rebuttal for the State and, after interviewing the witness, Johnson's counsel elected not to have him take the stand on his client's behalf.

Johnson readily admits that the trial judge had no duty to make efforts to locate the missing witness for him, but he nevertheless complains that once the judge undertook the task of assisting the defense in this regard, he could not abandon the quest. Appellant cites no authority for this imaginative claim and we reject it. As no subpoena had been issued for the witness, the court had no legal basis for commanding his presence at trial.

### f.

Johnson additionally contends that, because the evidence adduced at trial demonstrates he was not present when his accomplices initially seized the victim, he cannot be guilty of kidnapping. It is argued in this regard that actual seizure of the victim is an essential element of the offense of kidnapping. We do not agree. Kidnapping is, in essence, false imprisonment aggravated by carrying the victim to some other place, although at early common law, the accused

had to carry the person kidnapped into another country to constitute the offense. *Midgett v. State,* 216 Md. 26, 38-40, 139 A.2d 209, 215-16 (1958); *Wharton's Criminal Law* (14th ed. 1979), § 210; Hockheimer, *American Criminal Law* (1911), § 41. False imprisonment is merely the restraint of one's freedom of locomotion against his will without authority of law, *id.,* and the element of carrying the victim is self-explanatory. Md. Code (1957, 1976 Repl. Vol.), Art. 27, § 337 concerning kidnapping reads as follows:

> Every person, his counsellors, aiders or abettors, who shall be convicted of the crime of kidnapping and forcibly or fraudulently carrying or causing to be carried out of or within this State any person . . . with intent to have such person carried . . . or . . . concealed . . . shall be guilty of a felony. . . .

As this Court noted in *Midgett v. State, supra,* 216 Md. at 39-40, 139 A.2d at 216, the enactment reflects "the basic common law concept that to constitute kidnapping [as opposed to false imprisonment] there must be a *carrying* of the person from the place where he is seized to some other place either out of or within this state." (emphasis in original.) It is thus manifest that the crux of the crime of kidnapping in this jurisdiction today is false imprisonment aggravated by some measure of transportation of the victim. See *Midgett v. State, supra; Dean v. State,* 46 Md. App. 536, 537-38, 420 A.2d 288, 290 (1980); *Tate v. State,* 32 Md. App. 613, 616-17, 363 A.2d 622, 625 (1976). Johnson, by his own testimony, admitted participation in the transportation of the victim to the deserted area of Baltimore County. It was the defendant alone, however, who then led the blindfolded victim into the woods to murder her. This evidence more than suffices to support conviction of appellant for kidnapping. See *Carpenter v. United States,* 264 F.2d 565, 572 (4th Cir. 1959) (immaterial which defendant first seized kidnap victim or which one was driving; if they were acting in concert, voluntarily in pursuit of joint purpose, each was responsible not as co-conspirator but as a principal).

g.

As his final contention concerning the rectitude of the guilt determining phase of trial, appellant asserts that he was not afforded adequate assistance of counsel and that this failure requires reversal on appeal. It is clear that appellant did not object at trial or sentencing to the adequacy of his representation and that the trial judge took no testimony or made any findings in this regard.[14] Johnson, nevertheless, through new counsel, strives in this appeal to portray his former lawyer as ineffective by asserting that the record as a whole demonstrates a failure to develop at trial a coherent defense theory. Citing many alleged errors by counsel appearing on the face of the record, appellant asks this Court to pass on the question of his counsel's competence.

We previously stated in *State v. Zimmerman,* 261 Md. 11, 24, 273 A.2d 156, 163 (1971), "[w]hat we consider to be the desirable procedure" for consideration of claims of inadequate assistance of counsel when the issue was not presented to the trial court, and we adhere to that view. In essence, it is because the trial record does not ordinarily illuminate the basis for the challenged acts or omissions of counsel, that a claim of ineffective assistance is more appropriately made in a post conviction proceeding pursuant to Md. Code (1957, 1976 Repl. Vol., 1981 Cum. Supp.), Art. 27, § 645A. *Davis v. State,* 285 Md. 19, 36, 400 A.2d 406, 414-15 (1979); *State v. Zimmerman, supra; see also White v. State,* 17 Md. App. 58, 64-67, 299 A.2d 873, 876 (1973); *Harris v. State,* 2 Md. App. 408, 234 A.2d 781 (1967). Moreover, under the settled rules of appellate procedure, a claim of ineffective assistance of counsel not presented to the trial court generally is not an issue which will be reviewed initially on direct appeal, *Berndt v. Warden,* 240 Md. 701, 213 A.2d 471

---

14. We agree that "[a]s a practical matter, ineffectiveness of counsel claims are not likely to be raised at the trial level. Few lawyers will challenge their own conduct of a trial, and client dissatisfaction does not usually surface until after the verdict is in." Bines, *Remedying Ineffective Representation in Criminal Cases: Departures from Habeas Corpus,* 59 Va.L.Rev. 927, 939 (1973). Although infrequently, defendants have presented the issue of counsel's competence to the trial judge. *E.g.,* White v. State, 17 Md. App. 58, 64-67, 299 A.2d 873, 876 (1973).

(1965); *State v. Zimmerman, supra;* see *White v. State, supra; Bailey v. State,* 6 Md. App. 496, 252 A.2d 85 (1969); *Harris v. State, supra; see also* Md. Rules 885, 1085, although competency of counsel may be raised for the first time at a section 645A post conviction proceeding. *Davis v. State, supra; see Curtis v. State,* 284 Md. 132, 395 A.2d 464 (1978). Upon such a collateral attack, there is presented an opportunity for taking testimony, receiving evidence, and making factual findings concerning the allegations of counsel's incompetence. *Wilson v. State,* 284 Md. 664, 675, 399 A.2d 256, 262 (1979); see Md. Rule BK 44. By having counsel testify and describe his or her reasons for acting or failing to act in the manner complained of, the post conviction court is better able to determine intelligently whether the attorney's actions met the applicable standard of competence. Where, as here, the record sheds no light on why counsel acted as he did, direct review by this Court would primarily involve "the perilous process of second-guessing" *People v. Miller,* 7 Cal.3d 562, 102 Cal. Rptr. 841, 848, 498 P.2d 1089 (1972), perhaps resulting in an unnecessary reversal in a case where sound but unapparent reasons existed for counsel's actions.[15] Consequently, we leave consideration of Johnson's ineffective representation claim to the circuit court upon post conviction proceeding where there can be a studied evaluation of a proper record should appellant choose to pursue the matter. *See, e.g., Jones v. Warden,* 244 Md. 720, 224 A.2d 274 (1966); *Davis v. State,* 285 Md. 19, 36-37, 400 A.2d 406, 414-15 (1979); see Md. Rule BK 45b.[16]

---

**15.** We recognize that it is conceivable there may be presented a case on direct review where error by counsel at trial is so blatant and egregious that, assuming the issue is properly presented, an appellate court may determine from the face of the record that an accused was not afforded adequate representation. Given the secretive nature of trial tactics, however, such a case will be rarely presented.

**16.** Johnson, anticipating this disposition of his ineffective counsel claim, asserts that reference of the issue to post conviction relief would "thwart the purpose" of Md. Code (1957, 1976 Repl. Vol., 1981 Cum. Supp.), Art. 27, § 414 which provides for direct review by this Court of cases where a death penalty has been imposed. This position is belied by the terms of both sections 414 and 645A of Article 27. Section 414 (e) contemplates review of the death sentence imposed "[i]n addition to the consideration of any errors *properly* before the Court on appeal . . .," while section 645A authorizes post conviction proceedings on behalf of "[a]ny person convicted of a crime and

## II. The Sentencing Proceedings

### a.

We turn now to examine Johnson's contentions concerning the sentence of death, imposed by the same jury that determined his guilt following a subsequent sentencing hearing held pursuant to Md. Code (1957, 1976 Repl. Vol., 1981 Cum. Supp.), Art. 27, § 413, which establishes a bifurcated trial on the issues of guilt and sentencing whenever the state seeks the death penalty.[17] Initially, appellant launches a two-pronged attack on the constitutionality of this statute. He asserts that the death penalty is *per se* cruel and unusual punishment as measured against the standards of the Maryland Constitution. Alternatively, Johnson contends that the statute authorizing imposition of the death sentence unconstitutionally places the burden of proving mitigating circumstances on the defendant. Both arguments presented here were thoroughly considered and rejected, however, in our recent decision of *Tichnell v. State,* 287 Md. 695, 720-34, 415 A.2d 830, 843-50 (1980), and we deem the matter to be settled.

### b.

Johnson next asserts that the failure of the jury expressly to acknowledge the uncontroverted fact that he had not been convicted of any prior crime of violence demonstrates that he was sentenced to death in violation of section 413 which requires that this mitigating factor be recognized and bal-

---

either incarcerated *under sentence of death* or imprisonment. . . ." (emphasis supplied.) Clearly, these statutory provisions authorize decisions of this Court, acting in accord with ordinary and settled principles of appellate review, determining which issues in a death penalty case are properly presented for direct appellate review and which are best left for consideration at a section 645A post conviction proceeding. We note that section 414 of the death penalty statute, when construed in conjunction with section 645A, provides for direct review by this Court of any post conviction proceedings in a case where the death penalty has been imposed.

17. For a full discussion of the application of the death penalty statute, see Tichnell v. State, 287 Md. 695, 415 A.2d 830 (1980). In the interest of brevity, we shall quote in this opinion only those portions of the enactment relevant to our discussion of the issues.

anced against the aggravating factors present in his case, and we agree. In so doing, we note that section 414 (e) of Article 27 directs two varieties of review by this Court of death penalty cases. We may, of course, perform the normal appellate function and hear any errors "properly before [this] Court on appeal." In addition, beyond any legal issues raised in a death penalty case, we are required in accord with statutory guidelines to review the propriety of the imposition of the death penalty itself, a function not usually performed in this State at the appellate level. Because in this case we vacate the sentence due to failure to follow the sentencing procedure set forth in the statute, we have no occasion to review the appropriateness of the imposition of the death penalty here.

Section 413 is structured to guide the discretion vested in the sentencing authority with "clear and objective standards" to ensure that the death penalty is not inflicted in an arbitrary and capricious manner in violation of constitutional principles. *Tichnell v. State, supra,* 287 Md. at 722-29, 415 A.2d at 844-48; *see Gregg v. Georgia,* 428 U.S. 153, 96 S. Ct. 2909, 49 L.Ed.2d 859 (1976); *Proffitt v. Florida,* 428 U.S. 242, 96 S. Ct. 2960, 49 L.Ed.2d 913 (1976); *Jurek v. Texas,* 428 U.S. 262, 96 S. Ct. 2950, 49 L.Ed.2d 929 (1976). To this end:

> the sentencing authority — either the judge or jury — must first consider whether, beyond a reasonable doubt, any of ten statutory aggravating circumstances exist. § 413 (d).[18] If the sentencing authority does not find beyond a reasonable doubt the existence of one or more of the aggravating circumstances, then the sentence shall be life imprisonment. § 413 (f). If, however, the sentencing authority finds beyond a reasonable doubt the

---

**18.** To support imposition of the death penalty in this case, the state relied upon two statutory aggravating circumstances, namely, that "[t]he victim was a hostage taken or attempted to be taken in the course of a kidnapping or abduction or an attempt to kidnap or abduct," and "[t]he defendant committed the murder while committing or attempting to commit robbery, arson, or rape or sexual offense in the first degree." § 413

existence of one or more aggravating factors, then it must determine whether, by a preponderance of the evidence, any one of eight mitigating circumstances exist. § 413 (d).[19] The statute requires that a sentence of life imprisonment be imposed if, by a preponderance of the evidence, the sentencing authority finds that the mitigating circumstances outweigh the aggravating circumstances. § 413 (h) (1) and (3). If the mitigating circumstances do not outweigh the aggravating circumstances by a preponderance of the evidence, however, then a sentence of death must be imposed. § 413 (h) (1) and (2). [*Tichnell, supra* at 725-26, 415 A.2d at 846-47.]

In order for this Court to determine that the death sentence was not arbitrarily directed but, rather, resulted from

---

(d) (4) and (10). The jury found both aggravating factors to be present in this case and the evidence clearly supports the jury's findings in this regard.
   **19.** The statutorily denominated mitigating factors are:

(1) The defendant has not previously (i) been found guilty of a crime of violence; (ii) entered a plea of guilty or nolo contendere to a charge of a crime of violence; or (iii) had a judgment of probation on stay of entry of judgment entered on a charge of a crime of violence. As used in this paragraph, "crime of violence" means abduction, arson, escape, kidnapping, manslaughter, except involuntary manslaughter, mayhem, murder, robbery, or rape or sexual offense in the first or second degree, or an attempt to commit any of these offenses, or the use of a handgun in the commission of a felony or another crime of violence.

(2) The victim was a participant in the defendant's conduct or consented to the act which caused the victim's death.

(3) The defendant acted under substantial duress, domination or provocation of another person, but not so substantial as to constitute a complete defense to the prosecution.

(4) The murder was committed while the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired as a result of mental incapacity, mental disorder, emotional disturbance, or intoxication.

(5) The youthful age of the defendant at the time of the crime.

(6) The act of the defendant was not the sole proximate cause of the victim's death.

(7) It is unlikely that the defendant will engage in further criminal activity that would constitute a continuing threat to society.

(8) Any other facts which the jury or the court specifically sets forth in writing that it finds as mitigating circumstances in the case.

the guided consideration required of the sentencing authority by section 413 as well as the federal constitution, adequate information concerning the sentencing decision must be revealed. Consequently, section 413 (i), (j) requires that the sentencing determination be unanimous, be in writing, and that it specifically state:

(1) Which, if any, aggravating circumstances it finds to exist;

(2) Which, if any, mitigating circumstances it finds to exist;

(3) Whether any mitigating circumstances found under subsection (g) outweigh the aggravating circumstances found under subsection (d);

(4) Whether the aggravating circumstances found under subsection (d) are not outweighed by mitigating circumstances under subsection (g); and

(5) The sentence, determined in accordance with subsection (f) or (h).

To further aid our review of the determination to impose the death penalty and in accord with the authority vested in this Court pursuant to section 413 (1), we adopted Maryland Rule 772A. This rule provides for a standard form verdict sheet where the sentencing body is required to indicate, by marking appropriate spaces, its consideration of each statutorily required step in the penalty determining process.[20] Moreover, the rule requires a detailed report by the trial judge providing additional information about the trial, the offense, the defendant, and the victim. All of this data thus provides the basis for our review of the jury's determination to end the life of the defendant.

---

**20.** The form (as applied to jury sentencing) first lists the aggravating factors and provides that the panel respond either "yes" or "no" to each depending on whether or not it unanimously finds a particular aggravating factor beyond a reasonable doubt. Should an aggravating factor be found, the form directs the jury to consider in a similar manner whether, by a preponderance of the evidence, there exists any of the statutory mitigating factors. The jury is next asked to indicate whether, by a preponderance of the evidence, the mitigating circumstances marked "yes" outweigh the aggravating circumstances so identified. Finally, the jurors must indicate the sentence imposed and each must sign the form.

Johnson claimed at the sentencing hearing that several mitigating circumstances existed in his case. Of these, at least one — that he had no criminal record of a prior enumerated crime of violence — was not controverted and thus, as a matter of law, defendant has met his burden and the jury was required to recognize its existence. Nevertheless, the jury indicated that it found no mitigating circumstances and the State acknowledges that the panel was mistaken in this regard. It may be that the jurors actually considered Johnson's lack of a record of any prior crime of violence but either did not feel that it outweighed the aggravating factors present in this case or inadvertently marked the wrong answer. We will not pretend omniscience, however, particularly when considering the fate of one sentenced to death, and the penalty statute does not permit it. Our review in this regard, of necessity, encompasses only what the sentencing authority specifically states as its basis for imposing the death penalty. We do not in this case purport to control *how* a particular mitigating factor is used by the sentencing authority in its penalty determining calculus. Johnson, however, does have the statutory (and constitutional) right to have such information specifically considered by the sentencing jury and this Court is obligated to enforce that procedure. *Cf., Wash., B. & A.R. Co. v. Kimmey,* 141 Md. 243, 118 A. 648 (1922) (no review of discretionary denial of motion for new trial, but appellate court will ensure that proper evidence is considered by lower court). Where, as here, the sentencing authority fails to indicate the existence of a factor commanded by the legislature to be considered in mitigation of the death penalty, it is manifest that the sentence was imposed in violation of the statutory design, thus compelling us to vacate it. Were the sentencing authority free to disregard the existence of a mitigating factor and impose sentence without considering it, the statute authorizing such arbitrary imposition of the death penalty would be rendered patently unconstitutional. *See Tichnell v. State, supra; Furman v. Georgia,* 408 U.S. 238, 92 S. Ct. 2726, 33 L.Ed.2d 346 (1972); *Gregg v. Georgia, supra; Proffitt v. Florida, supra; Jurek v. Texas, supra.* Accord-

ingly, because the death penalty was unlawfully imposed, we will vacate it and remand the case for a new sentencing proceeding under section 413.[21]

### c.

We address the remaining sentencing issue because at the hearing for redetermination of Johnson's punishment for the murder, the trial court will again be confronted with it. At sentencing, the trial judge, over Johnson's objection, permitted the state to read to the jury his explicit confession to the murder of Ester Rosenblatt for which he was then under indictment but had not yet been tried. Johnson urges that the admission of his highly prejudicial Rosenblatt murder confession was error because the statement "was unrelated to any aggravating factor" contained in the statute, and, moreover, rebutted nothing. We do not take such a limited view of the range of information properly presentable in a death penalty case to the sentencing authority (in this case a jury), however, and begin our analysis by pointing out that evidence of criminal conduct for which a defendant has not been convicted is clearly admissible for sentencing purposes when that task is performed by a judge in a case not involving a section 413 death penalty proceeding. *Logan v. State,* 289 Md. 460, 480-87, 425 A.2d 632, 642-46 (1981); *Purnell v. State,* 241 Md. 582, 217 A.2d 298 (1965). We only a few months ago stated in *Logan v. State* that:

> [i]n considering what is proper punishment, it is now well-settled in this State that a judge is not

---

**21.** The problem presented by this case may be avoided by the trial court specifically instructing the jury that it must accept and consider any mitigating factor conceded to exist. Section 413 (c) (3), which declares that "in addition to *any other appropriate instructions* permitted by law, the court shall instruct the jury as to the findings it must make ... and the burden of proof" (emphasis added), provides ample basis for giving such guidance. Moreover, we mention that the trial judge and counsel, before the jurors are dismissed after the death penalty has been imposed, should carefully peruse the verdict sheet so that any errors in the sentencing process apparent from the form can be corrected.

limited to reviewing past conduct whose occurrence has been judicially established, but may view "reliable evidence of conduct which may be opprobrious although not criminal, as well as details and circumstances of criminal conduct for which the person has not been tried. . . ." [*Logan v. State, supra,* 289 Md. at 481, 425 A.2d at 643 (citations omitted).]

There is no reason in principle why this concept of sentencing should not apply in a section 413 death penalty proceeding even though the sentencing authority can, by election of the defendant, be reposed in either judge or jury. We observe nothing in the enactment which in any way contradicts this view, and in fact, a fair reading of the statute, particularly section 413 (c), embraces it. That section sets forth the following "type of evidence admissible in [the sentencing] proceeding:"

(i) Evidence relating to any mitigating circumstance listed in subsection (g);

(ii) Evidence relating to any aggravating circumstance listed in subsection (d) of which the State had notified the defendant pursuant to § 412(b);

(iii) Evidence of any prior criminal convictions, pleas of guilty or nolo contendere, or the absence of such prior convictions or pleas, to the same extent admissible in other sentencing procedures;

(iv) Any presentence investigation report. However, any recommendation as to sentence contained in the report is not admissible; and

(v) *Any other evidence that the court deems of probative value and relevant to sentence, provided the defendant is accorded a fair opportunity to rebut any statements.* [(emphasis supplied).]

In our view, part (v) in unambiguous terms authorizes the trial court to admit into evidence before the sentencing jury identical information concerning a defendant's criminal conduct as would normally be considered by the judge if he were

imposing sentence in a non-death penalty case. As is true in all other criminal causes, the sentencing authority in a death penalty case should be presented with a full range of relevant information so as to fashion a particular penalty in accord with "the prevalent modern penal philosophy of individualized punishment." *Logan v. State, supra,* 289 Md. at 481, 425 A.2d at 643. The task that the sentencer must perform in this regard is thus basically no different from that carried out daily by trial judges in other types of cases. Therefore, evidence of a convicted person's confession to prior criminal conduct, voluntarily made, may be admitted at sentencing pursuant to section 413 (c) (v) if the court deems it to be of probative value and relevant to sentence, "provided the defendant is accorded a fair opportunity to rebut any statements" and challenge their voluntariness.[22] Those jurisdictions which have addressed the question here presented are in substantial accord with this view. *E.g., United States v. Dalhover,* 96 F.2d 355, 360 (7th Cir. 1938), *cert. denied,* 305 U.S. 632 (1938); *People v. Morse,* 70 Cal.2d 711, 76 Cal. Rptr. 391, 411 (1969) (en banc), *cert. denied,* 397 U.S. 944 (1970); *State v. Mackey,* 553 S.W.2d 337, 342-45 (Tenn. 1977); *Commonwealth v. Hoss,* 445 Pa. 98, 283 A.2d 58, 68-69 (1971); *Hammett v. State,* 578 S.W.2d 699, 709 (Tex. Crim. App. 1979) (en banc). *See Jurek v. Texas,* 428 U.S. 262, 96 S. Ct. 2950, 2958, 49 L.Ed.2d 929 (1976) ("essential ... that the [sentencing] jury [in a death penalty case] have before it all possible relevant information about the individual defendant whose fate it must determine."); *Woodson v. North Carolina,* 428 U.S. 280, 304, 96 S. Ct. 2978, 2991, 49 L.Ed.2d 944 (1976) ("consideration of the character and record of the individual offender and the circumstances of the particular offense [is] a constitutionally indispensable part of the process of inflicting the penalty of

---

22. *Johnson took advantage of this statutorily granted rebuttal right.* He submitted Dwayne Mayer's confession to the same murder which, although involving Johnson in the crime, portrayed Mayers as the killer of Ms. Rosenblatt. Mayers had been convicted of the Rosenblatt murder at the time of the sentencing proceedings in this case and this fact was also presented to the jury. In addition, Johnson personally addressed the jurors and denied involvement in the Rosenblatt killing.

death") (plurality). *See generally* Annot. 96 A.L.R.2d 768, §§ 12-15 and later case service.

> *Judgment of conviction and sentences affirmed, except as to the imposition of the death sentence for murder: death sentence vacated and case remanded to the Circuit Court for Calvert County for a new sentencing proceeding under § 413 of Article 27.*

*Eldridge, J., dissenting:*

In at least two respects, I do not agree with the majority opinion in this case. First, for the reasons set forth in Judge Cole's dissenting opinion, the representation by Johnson's lawyer was so inadequate that the defendant was deprived of his right to counsel under the Sixth Amendment to the United States Constitution and Art. 21 of the Maryland Declaration of Rights. Second, for the reasons set forth below, I disagree with the majority's holding that a criminal defendant, charged with first degree murder or other crime requiring specific intent, is not entitled to present evidence of his mental condition to show that necessary elements of the alleged offense were absent. The convictions should be reversed, and the case should be remanded for an entirely new trial.

I.

With regard to the admissibility of evidence concerning Johnson's mental condition, the factual background is as follows. After the insanity plea was withdrawn, the only defense which Johnson's attorney attempted to present in this capital case was that, in light of Johnson's mental condition, the elements of first degree murder and other specific intent crimes were absent. For this purpose, defense counsel

offered the testimony of an expert witness, a psychologist employed by the State of Maryland. The experienced trial judge, consistent with prior Maryland law, held that the evidence was admissible for such purpose.[1] The psychologist then testified about Johnson's mental condition, tests which he ran on Johnson, and his conclusions. In addition, portions of the psychologist's report were admitted. On appeal to this Court, neither side raised any issue concerning the general admissibility of this type of evidence.[2] Instead, the appellant contended that the trial judge erred in not allowing all of the psychologist's report to be presented to the jury. The State, without disputing the admissibility of the expert testimony, argued that the trial court correctly excluded a portion of the

---

1. After defense counsel questioned Dr. Ernest Kamm concerning his qualifications, the following colloquy took place:

"DEFENSE ATTORNEY: Your Honor, I would offer him as an expert.

"PROSECUTING ATTORNEY: No objection. But I object to his testimony.

"JUDGE BOWEN: What?

"PROSECUTING ATTORNEY: I don't object to his qualifications but I object to his testimony.

"DEFENSE ATTORNEY: He hasn't testified yet.

"PROSECUTING ATTORNEY: I'd like to approach the Bench.

"JUDGE BOWEN: All right.

"(Whereupon a conference is held at the Bench out of the presence of the Jury and with the defendant present, and the following proceedings were had:)

"PROSECUTING ATTORNEY: Your Honor, the defense has withdrawn their insanity pleas and we object to his testimony.

"DEFENSE ATTORNEY: I don't intend to do that.

"JUDGE BOWEN: Do you want to proffer what you are trying to do?

"DEFENSE ATTORNEY: Your Honor, I'm trying to show how Doctor Kamm evaluated the defendant for the State. He ran certain tests. I am not trying to show that the defendant was incompetent or mentally incompetent at the time of the offense. I want the report and testimony of Doctor Kamm to go to the mitigation of First Degree Murder and any specific crimes. I have no intention of offering his —

"JUDGE BOWEN: You're talking about intelligence?

"DEFENSE ATTORNEY: Intelligence and the rest of it.

"JUDGE BOWEN: Within that limits we will permit it."

2. Although appellants' attorneys did discuss the general question in a footnote in their brief in this Court, the discussion was in connection with the question of trial counsel's inadequacy.

report because it "was simply not germane to the issue of diminished capacity." (Appellee's brief, p. 23).

The majority opinion, instead of deciding the issue which was presented, briefed and argued by the parties, now holds that the entire expert testimony and the entire report were inadmissible. On this basis, the majority finds no reversible error in the exclusion of a portion of the psychologist's report. Of course, an appellate court will ordinarily affirm a judgment of the trial court on any ground adequately shown by the record, even though the ground was neither relied on by the trial court nor raised by the parties. *Temoney v. State,* 290 Md. 251, 261, 429 A.2d 1018 (1981), and cases there cited. Consequently, I do not question the propriety of this Court's dealing with the broad admissibility issue. However, I do question whether, under all of the circumstances, it is appropriate to resolve the issue against the defendant Johnson without first giving him an opportunity to brief and argue the matter.

## II.

Turning to the merits of the majority's position, in my view the trial court correctly held that evidence of Johnson's mental condition was admissible for the purpose of showing the absence of certain elements of first degree murder and of the other specific intent crimes with which Johnson was charged. The majority's contrary holding represents an abrupt departure from prior Maryland law as well as from the prevailing view throughout the country. Moreover, it constitutes an unwarranted limitation upon a criminal defendant's constitutional right to present relevant evidence in his own defense.

The majority arrives at its holding by confusing two entirely distinct matters: (1) the existence of criminal conduct when a particular mental state is an element of the crime charged; (2) responsibility for criminal conduct. The confusion is enhanced by the majority's use of the terms

"capacity" and "capability" interchangeably with "responsibility" and "culpability."[3]

The defendant Johnson, *inter alia,* was charged with murder in the first degree under Maryland Code (1957, 1976 Repl. Vol.), Art. 27, § 407. In order to constitute first degree murder under § 407, the homicide must be a "wilful, deliberate and premeditated killing." Consequently, the State had the burden of proving the existence of these three elements. *See Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975); *State v. Evans,* 278 Md. 197, 362 A.2d 629 (1976). The mental condition of a defendant is obviously relevant to willfulness, deliberation and premeditation. These elements of murder have been defined by this Court on numerous occasions. In *Faulcon v. State,* 211 Md. 249, 257, 126 A.2d 858 (1956), Judge Collins stated for the Court:

> "For a homicide to be 'wilful' there must be a specific purpose and design to kill. To be 'deliberate' there must be a full and conscious knowledge of the purpose to kill. To be 'premeditated' the design to kill must have preceded the killing by an appreciable length of time; that is, time enough to be deliberate. To justify a conviction of murder in the first degree the jury or court, sitting without a jury, must find the actual intent, the fully formed purpose to kill, with enough time for deliberation and premeditation."

*Accord: Gladden v. State,* 273 Md. 383, 387-388, 330 A.2d 176 (1974), and cases there cited. "Specific purpose and design to kill" and "full and conscious knowledge of the purpose to kill" certainly involve a defendant's mental state. Evidence designed to show that a particular defendant was incapable of having the requisite mental state is nothing more or less than evidence designed to show that he did not commit the crime with which he was charged.

---

3. Unfortunately, the careless use of the English language in this regard is not limited to the majority's opinion. *See, e.g.,* W. R. La Fave & A. W. Scott, Jr., *Handbook on Criminal Law,* 325-332 (1972).

On the other hand, under Maryland law criminal *responsibility* due to mental condition is a wholly different matter. Unlike the common law concept of "not guilty by reason of insanity," the Maryland statutory scheme concerning criminal responsibility contemplates an initial determination that the defendant did commit the crime charged before there is an inquiry into his responsibility therefore. This was made clear recently in *Langworthy v. State,* 284 Md. 588, 399 A.2d 578 (1979), in which we held that a defendant, charged with rape, was entitled to take an appeal even though he successfully interposed the defense that he was insane when the alleged crime was committed. Judge Orth there stated for a unanimous Court (284 Md. at 598):

> "The Court of Special Appeals dismissed Langworthy's appeal, holding that 'a defendant, except under rare circumstances not here apposite, has no right to take an appeal from an acquittal.' *Langworthy v. State,* 39 Md. App. at 559-560. The fallacy in this reasoning is that Langworthy was found guilty of rape, and the dismissal of the appeal precluded appellate review of that conviction. As we have seen, the existing statutory scheme patently contemplates that there be first a determination of guilt or innocence under the general plea.

> * * *

> "In short, the clear legislative intent regarding the successful interposition of a plea of insanity is not that an accused is to be found not guilty of the criminal act it was proved he committed, but that he shall not be punished therefor. Rather than be punished, he may go free or, under prescribed circumstances, be provided treatment for his mental disorder. Thus, the Court of Special Appeals was not correct when it indicated that Langworthy was 'not guilty' by reason of insanity nor was the trial judge correct when he spoke in those terms in indicating from the bench what he intended to do."

The Court went on to note the difference between the *mens rea,* which is an element of the crime, and the mental state required for an insanity defense (*id.* at 599, n.12):

> "We believe the reference to 'not guilty by reason of insanity' is a holdover from common law concepts and prior statutory provisions regarding insanity and the commission of crimes. In light of the clear provisions of § 25, we do not consider §§ 27 and 28 as authorizing or calling for a verdict of 'not guilty by reason of insanity.'
>
> "We do not subscribe to the theory of the Court of Special Appeals that a finding that a defendant was insane a⁺ the time of the commission of the crime means that '[t]here is no crime.' Langworthy v. State, 39 Md. App. 559, 561, 387 A.2d 634 (1978). Its reasoning was that the finding of insanity establishes a lack of the *mens rea. Id.* We do not think that this is so in light of the conditions prescribed for a finding of insanity, namely 'as a result of mental disorder, [a defendant] lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.' Code (1957, 1972 Repl. Vol.) art. 59, § 25 (a). Neither of these tests is necessarily at variance with a general intent to commit a crime. *See* Gardner v. State, 41 Md. App. 187, 396 A.2d 303 (1979)."

Until today, this Court has regularly distinguished evidence of a defendant's mental state designed to negate the existence of a crime from evidence of insanity designed to show that he was not *responsible* for a crime which was in fact committed. Whenever the existence of a particular mental state is an element of a criminal offense with which the defendant has been charged, the Court has consistently held that evidence of the defendant's mental *capability* is admissible to show the absence of that element, and thus the absence of criminal conduct.

For example, in *Chisley v. State,* 202 Md. 87, 107-109, 95

A.2d 577 (1953), involving a conviction of first degree murder and the imposition of a death sentence, evidence of the defendant's mental capability due to drunkenness was deemed properly admissible in order for the jury to determine the degree of homicide. The Court, in an opinion by Judge Hammond, quoted with approval *Warren on Homicide,* Vol. 1, § 61, that "[w]here murder is divided into degrees, the fact of drunkenness at the time of the homicide may be considered by the jury in determining the degree of murder." 202 Md. at 107. This Court went on to cite *Hopt v. People,* 104 U.S. 631, 26 L.Ed. 873 (1882), for the principle "that under a statute establishing different degrees of murder, the question of whether the accused was in such a *condition of mind* by reason of drunkenness, *or otherwise* to be *capable* of deliberation and premeditation, becomes a material subject of consideration by the jury." 202 Md. at 107, emphasis supplied. The Court in *Chisley* concluded this portion of the opinion by indicating that the jury was properly charged "as to the necessity for considering the effect of intoxication on the formation and existence of willfulness, deliberation and premeditation." *Id.* at 108.

Later, in *Beall v. State,* 203 Md. 380, 385, 101 A.2d 233 (1953), the Court reiterated that mental incapability due to drunkenness may be considered by the jury in determining the degree of murder. *See also Avey v. State,* 249 Md. 385, 388, 240 A.2d 107 (1968), where this Court expressly approved of the statement by the Court of Special Appeals that "where intoxication exists to a degree that it deprives the accused of his *capacity to form a specific intent,* he cannot be convicted of a crime requiring that intent . . . ." [4]

In support of its holding that the expert psychological testimony was inadmissible in this case to show that the degree of homicide was less than first degree murder and to show

---

4. With regard to diminished mental capacity due to intoxication, the majority today states that the "degree of intoxication necessary to negate *mens rea* is great and is comparable with that degree of mental incapacity that will render a defendant legally insane" and that "[l]esser degrees of incapacity, whether produced by intoxication or organic mental impairment will not relieve a defendant of full responsibility for his acts." This statement is contrary to *Chisley, Beall* and other Maryland cases.

the absence of the specific intent required under some of the other charges, the majority cites *Armstead v. State,* 227 Md. 73, 175 A.2d 24 (1961) and *Allen v. State,* 230 Md. 533, 188 A.2d 159 (1963). However, these cases do not support the majority position. Moreover, they clearly recognize the distinction which the majority today blurs, that is the distinction between evidence of *mental incapacity,* which is admissible to show lack of premeditation and deliberation, and the test for *criminal responsibility.* In *Armstead v. State, supra,* the defendant was convicted of first degree murder. At the trial, evidence was admitted showing that the defendant was "an epileptic who, occasionally, had suffered seizures of the grand mal type," 227 Md. at 74. On the other hand, a letter from the Chief Medical Officer of the Supreme Bench of Baltimore City, Dr. Manfred Guttmacher, was introduced into evidence, in which Dr. Guttmacher stated that the defendant "had too clear a memory of what transpired at the time of the offense for it to have occurred during an epileptic seizure." *Id.* at 75. The defendant in *Armstead* conceded that she was not insane under the *McNaughten* test for insanity then in effect and conceded that the evidence showed that she was guilty of second degree murder. Nevertheless, she argued that the trial court should have directed a verdict as to first degree murder on a diminished *responsibility* theory because she was an epileptic. *Id.* at 74-75. The defendant recognized that her argument required a modification in the test for insanity. She further recognized that her particular diminished *responsibility* theory, although close, was different from the principle that mental condition is relevant in determining *capability* to deliberate and premeditate. *Id.* at 75-76. Faced with this argument, the Court in *Armstead* refused to modify the *McNaughten* test for insanity and adopt the criminal *responsibility* theory propounded by the plaintiff. At the same time, the Court in *Armstead* did set forth "the well-recognized principle of law that when a statute establishes different degrees of murder and requires deliberate premeditation in order to constitute murder in the first degree (as ours does), the question of whether the accused is

in such condition of mind as to be *incapable* of deliberate premeditation necessarily becomes a material subject of consideration. *Hopt v. People,* 104 U.S. 631; *Chisley v. State,* 202 Md. 87, 95 A.2d 577." 227 Md. at 76, emphasis supplied.

*Allen v. State, supra,* the second Maryland case relied on by the majority, is somewhat similar to *Armstead.* In *Allen,* the defendant was convicted in a nonjury trial of first degree murder. During the trial, he was allowed to introduce evidence showing that he was an epileptic. Also introduced in evidence was a medical report. The trial judge, as trier of fact, "found on the basis of the medical report that epilepsy played no primary role in the affair," 230 Md. at 534. The defendant in this Court argued that he was incapable of the premeditation necessary to sustain a charge of first degree murder. *Ibid.* This Court, treating the argument as having two prongs, first held that there was "no basis upon which to overturn his [the judge's] findings of fact." *Ibid.* In addition, the Court referred to *Armstead* as having rejected the "so-called diminished responsibility rule." *Ibid.*

The differences between the *Armstead* and *Allen* cases on the one hand, and the instant case on the other, are substantial. Unlike the majority's holding today, neither *Armstead* nor *Allen* suggested that the evidence of each defendant's abnormal mental condition was inadmissible to show the lack of willfulness, premeditation and deliberation. Instead, the inference from both cases is that the evidence was admissible. While those cases refused to change the test for criminal *responsibility,* they do not support the majority's holding regarding evidence showing *incapability* of having the mental state required for a first degree murder conviction. Instead, as previously mentioned, the Court in *Armstead* cited *Chisley v. State, supra,* 202 Md. at 107, for the rule that when a statute divides murder into degrees and requires deliberation and premeditation for first degree murder, "the question of whether the accused is in such condition of mind as to be incapable of deliberate premeditation necessarily becomes a material subject of consideration." 227 Md. at 76. The *Armstead* Court described this as a "well-recognized principle of law," *ibid.*

The majority purports to recognize that the State must prove every element of a crime, including mental elements such as specific intent, premeditation and deliberation. Nevertheless the majority asserts, without any reasoning, that "[t]here is a fundamental difference between evidence demonstrating that the defendant did not *as a fact* possess the requisite mental state, here premeditation and deliberation, as opposed to evidence establishing that the defendant was *generally less capable* than a normal person of forming a requisite *mens rea.*" However, I fail to perceive this "fundamental difference" referred to by the majority. A particular individual's abnormal mental capability is a *fact.* It is part of his mental state or condition. A defendant having an epileptic seizure is "generally less capable than a normal person" of premeditation and deliberation, as indicated by this Court in *Armstead v. State* and *Allen v. State.*

The majority also asserts that "the governing principle of the criminal law [is] that all legally sane individuals are equally capable of forming and possessing the same types and degrees of intent." No Maryland authority is cited for this proposition. Furthermore, it directly conflicts with the principle set forth in *Armstead,* in *Chisley v. State,* and other cases, that a defendant's mental condition is material in determining whether he is *"capable* of deliberation and premeditation," 202 Md. at 107, emphasis supplied.

The error and confusion in the view adopted today by the majority, was very well described by Chief Justice Weintraub for the Supreme Court of New Jersey in *State v. DiPaolo,* 34 N.J. 279, 294-296, 168 A.2d 401, *cert. denied,* 368 U.S. 880, 82 S.Ct. 130, 7 L.Ed.2d 80 (1961):

> "Next defendant contends that evidence of mental illness is competent upon the issue whether the crime was murder in the first degree or murder in the second degree.

> * * *

> "The difficulty seems to be that the topic is sometimes explored under the label of 'partial

responsibility' or 'diminished responsibility' or perhaps confused with some other concept intended to be so described. Both of those characterizations are misleading since they tend to connote an 'affirmative' defense designed to defeat a case the State has otherwise established and thus to suggest the intrusion of an amendment to the established basis for criminal accountability. Actually the question is simply whether there shall be excluded evidence which merely denies the existence of facts which the State must prove to establish that the murder was in the first degree.

\* \* \*

"We here are concerned with the category described as a 'willful, deliberate and premeditated killing.' ... As settled by judicial construction, the first element is premeditation, which consists of the conception of the design or plan to kill. Next comes deliberation. The statutory word 'deliberate' does not here mean 'willful' or 'intentional' as the word is frequently used in daily parlance. Rather it imports 'deliberation' and requires a reconsideration of the design to kill, a weighing of the pros and cons with respect to it. Finally, the word 'willful' signifies an intentional execution of the plan to kill which had been conceived and deliberated upon. . . .

"The three mental operations we have just described are matters of *fact*. The judiciary cannot bar evidence which rationally bears upon the factual inquiry the Legislature has ordered. The capacity of an individual to premeditate, to deliberate, or to will to execute a homicidal design, or any deficiency in that capacity, may bear upon the question whether he *in fact* did so act. Hence evidence of any defect, deficiency, trait, condition, or illness which rationally bears upon the question whether those mental operations did *in fact* occur must be accepted.

\* \* \*

"It has long been settled that voluntary intoxication or the voluntary use of drugs may be shown for the jury's consideration with respect to whether a defendant did in fact premeditate, deliberate and willfully kill.

\* \* \*

"Surely if voluntary intoxication or use of drugs is evidential with respect to the degree of murder, mental illness or deficiency should be accepted as a legally competent 'cause.' "

*See also, e.g., United States v. Brawner,* 471 F.2d 969, 999 (D.C. Cir. 1972); *Commonwealth v. Gould,* 405 N.E.2d 927 (Mass. 1980); Lewin, *Psychiatric Evidence in Criminal Cases for Purposes Other than the Defense of Insanity,* 26 Syracuse L. Rev. 1051, 1092, 1104 (1975).

As Justice Powell stated for the Supreme Court in *Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973), "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense." By holding that one accused of first degree murder is no longer entitled to present relevant testimony of his mental condition for the purpose of negating the elements of first degree murder, the majority today imposes an unjustified limitation upon the right of a criminal defendant to present evidence in his own behalf.

Finally, the majority adopts this new rule in a case where the State is seeking the death penalty. The consequences of not permitting evidence of a defendant's mental condition in support of his contention that the homicide is something less than first degree murder, may be extreme in cases like this. Even in murder cases where the death penalty is not being sought, due process would seem to require that a defendant be permitted to introduce evidence of his mental condition as bearing upon the degree of murder. In a capital case, however, I would find it extremely difficult to conclude that the

death penalty could be imposed consistent with due process requirements when the defendant is not allowed to introduce relevant evidence indicating the absence of the elements of first degree murder.

Judges Cole and Davidson have authorized me to state that they concur with the views expressed herein.

*Cole, J., dissenting:*

I agree with the majority that the sentence of death in this case must be vacated. I cannot agree, however, that the guilty verdict can stand. It is clear to me from the record that Johnson was denied his right to the effective assistance of counsel under the Sixth Amendment to the United States Constitution and under Article 21 of the Maryland Declaration of Rights; [1] that he, Johnson, was deprived of his sole defense under circumstances where his trial counsel knew or should have known that unless Johnson was insane, there was no exculpatory explanation for his conduct. I would reverse and grant a new trial.

The law is clear that the constitutional guarantee of the assistance of counsel in a criminal prosecution means *effective* assistance, *Hawk v. Olson,* 326 U.S. 271, 66 S. Ct. 116, 90 L. Ed. 2d 61 (1945); *McMann v. Richardson,* 397 U.S. 759, 771, n. 14, 90 S. Ct. 1441, 25 L. Ed. 2d 763 (1970), that lawyers in criminal courts are necessities, not luxuries, *Gideon v. Wainwright,* 372 U.S. 335, 344, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963), and that the assistance of counsel is a requisite element of a fair trial,[2] *Argersinger v. Hamlin,* 407 U.S. 25, 31, 92 S. Ct. 2006, 32 L. Ed. 2d 530 (1972). The basic

---

**1.** The Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right to . . . have the Assistance of Counsel for his defence." Article 21 of the Maryland Declaration of Rights provides: "That in all criminal prosecutions every man hath a right . . . to be allowed counsel . . . ."

**2.** The reason was stated with eloquent simplicity in Johnson v. Zerbst, 304 U.S. 458, 462-63, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938):

[The Sixth Amendment] embodies a realistic recognition of the obvious truth that the average defendant does not have the professional legal skill to protect himself when brought before a tribunal with the power to take his life or liberty, wherein the prosecution

purpose of a trial is the determination of truth, and it is self-evident that to deny a lawyer's help through the technical intricacies of a criminal trial is to impede that purpose and to infect a criminal proceeding with the clear danger of convicting the innocent. *Stovall v. Denno,* 388 U.S. 293, 297-98, 87 S. Ct. 1967, 18 L. Ed. 2d 1199 (1967).

So inherently basic to the concept of fairness is the right to effective assistance of counsel that it originated as a corollary of the right of due process. *See Pate v. Robinson,* 383 U.S. 375, 86 S. Ct. 836, 15 L. Ed. 2d 815 (1966). In *Powell v. Alabama,* 287 U.S. 45, 53 S. Ct. 55, 77 L. Ed. 158 (1932), the Supreme Court indicated that the right to counsel was a fundamental right, protected in the state courts by virtue of the Fourteenth Amendment due process clause. The first commonly accepted standard the state and lower federal courts used to gauge effectiveness was a "farce and mockery of justice" test. *See Daugherty v. Director, Patuxent Inst.,* 235 Md. 662, 202 A.2d 593 (1964); *Diggs v. Welch,* 148 F.2d 667 (U.S. App. D.C.), *cert. denied,* 325 U.S. 889, 65 S. Ct. 1576, 89 L. Ed. 2002 (1945). In order to prevail when asserting a Sixth Amendment claim, a defendant had to show that the ineffectiveness of counsel so prejudiced his cause that it rendered the trial fundamentally unfair.

The Sixth Amendment standard has undergone a rapid evolution in recent years, however, and the farce and mockery of justice standard has been almost universally rejected. *See* 10 Val. U. L. Rev. 509 (1976). The trend away from a due process analysis of the Sixth Amendment was given a compelling impetus by the Supreme Court in *McMann v. Richardson, supra.* In *McMann* a criminal defendant challenged the voluntariness of a guilty plea based on what the defendant alleged was the advice of incompetent counsel. In discussing competence, the Supreme Court held that a guilty plea is open to attack if a defendant can demon-

---

is presented by experienced and learned counsel. That which is simple, orderly and necessary to the lawyer, to the untrained layman may appear intricate, complex and mysterious.

strate that the advice given was not within the range of competence demanded of attorneys in criminal cases. *Id.* at 771. *See also, Tollett v. Henderson,* 411 U.S. 258, 266, 93 S. Ct. 1602, 18 L. Ed. 2d 1199 (1973). While not purporting to lay down a standard to be applied in all Sixth Amendment claims, the language of *McMann* has resulted in a change among most of the federal circuits and the majority of states regarding the method of analysis for judging effectiveness of counsel. *See, e.g., United States v. Bosch,* 584 F.2d 1113 (1st Cir. 1978); *Moore v. United States,* 432 F.2d 730 (3rd Cir. 1970); *Marzullo v. Maryland,* 561 F.2d 540 (4th Cir. 1977), *cert. denied,* 435 U.S. 1011, 98 S.Ct. 1885, 56 L. Ed. 2d 394 (1978); *MacKenna v. Ellis,* 280 F.2d 592 (5th Cir. 1960), *cert. denied,* 368 U.S. 877, 82 S. Ct. 121, 7 L. Ed. 2d 78 (1961); *Wilson v. Cowan,* 578 F.2d 166 (6th Cir. 1978); *United States ex rel. Healey v. Cannon,* 553 F.2d 1052 (7th Cir.), *cert. denied,* 434 U.S. 874, 98 S. Ct. 221, 54 L. Ed. 2d 153 (1977); *United States v. Easter,* 539 F.2d 663 (8th Cir. 1976), *cert. denied,* 434 U.S. 844, 98 S. Ct. 145, 54 L. Ed. 2d 109 (1977); *Cooper v. Fitzharris,* 586 F.2d 1325 (9th Cir. 1978), *cert. denied,* 440 U.S. 974, 99 S. Ct. 1542, 59 L. Ed. 2d 793 (1979); *People v. Frierson,* 25 Cal. App. 3d 142, 158 Cal. Rptr. 281, 599 P.2d 587 (1979); *State v. Anonymous,* 34 Conn. Supp. 656, 384 A.2d 386 (1978); *Commonwealth v. Bailey,* 480 Pa. 329, 390 A.2d 166 (1978). *See also* 17 Am. Crim. L. Rev. 233 (1979) (and cases cited therein).

The subject of effectiveness of counsel arose again in *Cuyler v. Sullivan,* 446 U.S. 335, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980). In *Cuyler,* a criminal defendant alleged that his attorney did not provide effective assistance of counsel because of a conflict of interest arising out of the lawyer's simultaneous representation of codefendants. The Court, while carefully avoiding the application of the *McMann* test to a case of multiple representation, reiterated the language of *McMann* as it applied to the voluntariness of guilty pleas. The Court went on to say that "a lawyer forced to represent codefendants whose interests conflict cannot provide the adequate legal assistance required by the Sixth Amendment." *Cuyler v. Sullivan, supra,* 446 U.S. at 345. The Court

further held that once a defendant has established an actual conflict which would result in a Sixth Amendment violation he "need not demonstrate prejudice in order to obtain relief." *Id.* at 349-50.

These cases do not provide a bright line rule by which the courts of the nation could be governed, but they do provide general guidance. It appears that to establish a Sixth Amendment violation a defendant must demonstrate that the advice given was not within the range of competence demanded of attorneys in criminal cases. *See Marzullo v. Maryland, supra.* Once the defendant has established that his counsel's representation failed to meet this standard the defendant does *not* need to show prejudice; the prejudice to the defendant's defense will be conclusively presumed from the inadequacy of his representation.

Having gleaned from the Supreme Court a general Sixth Amendment test, the problem remains in determining what types of conduct by a defense attorney would render his representation ineffective. While Justice William H. Erickson of the Colorado Supreme Court has suggested that the *American Bar Association Standards Relating to the Defense Function,* (1971 Approved Draft), can and should be used as the basis for a uniform standard, 17 Am. Crim. L. Rev. 233 (1979), most courts have not tried to be so definitive. A brief review of a few cases involving facts analogous to the instant case, however, will point out that the representation in this case was undeniably ineffective.

In *Wood v. Zahradnick,* 578 F.2d 980 (4th Cir. 1978), the defendant was accused and convicted of a senseless, brutal rape. The victim, a sixty-seven year old woman, had known the defendant for several years. The defendant made no attempt to conceal his identity during the crime and told his attorney he had no recollection of committing the offense. The defense attorney did not explore the possibility of an insanity defense, despite knowing that the defendant had been drinking and using heroin on the night in question. The Court of Appeals for the Fourth Circuit held that the defense attorney's representation was not within the range of

competence demanded of attorneys in criminal cases and remanded the case for a determination of the defendant's mental competency at the time of the offense.

In *People v. Frierson, supra,* the defendant was convicted of murder. At the time of the offense the defendant was under the influence of PCP and diminished capacity was his only defense. The defense counsel called no witnesses to express an expert opinion on the effects of PCP nor did he have the defendant examined by a psychiatrist. The court determined, based on the unanimous agreement of several practicing attorneys, that effective representation in this type of case would require investigative and expert assistance regarding the use of PCP and its effect and the appointment of a psychiatrist to assist counsel in his defense. The court found that because these minimal steps were not taken by the defense counsel that he had deprived himself of the reasonable bases upon which to make an informed tactical trial decision. Giving up the diminished capacity defense, where that was the sole defense, was tantamount to withdrawal of *any* legal defense — "a complete abandonment of the interest of the accused." *People v. Frierson, supra,* 599 P.2d at 599.

In *United States v. Easter, supra,* the defense attorney did not challenge a warrantless residence search, which was the defendant's only defense. The court held that "[i]t is fundamental, we think, to afford a defendant a fair trial on a criminal charge, that his counsel assert that which may be his only defense." *Id.* at 666.

In *Tillery v. United States,* 419 A.2d 970 (D.C. App. 1980), the defense attorney failed to investigate and pursue an insanity defense and based the examination of his own psychiatric expert upon an obsolete insanity standard. The court held that where the defendant's trial counsel's actions "effectively blotted out a substantial defense, [it] thereby depriv[ed] him of his Sixth Amendment right to the effective assistance of counsel." *Id.* at 976.

In *Wilson v. Cowan,* 578 F.2d 166 (6th Cir. 1978), the entire prosecution consisted of the personal identification of

the defendant by two victims. The defendant's sole defense was "that he was not guilty because he was not there," *id.* at 168, yet trial counsel failed to call two defense witnesses who would have corroborated the defendant's alibi. The court concluded that

> [w]e cannot escape the conviction that this record requires us to hold that ineffectiveness of counsel deprived appellant of his only defense. Even more important, we cannot escape the conviction that it also deprived the jury of the opportunity to hear arguably vital evidence which should have been weighed in the balance against the identification testimony. American justice and the Sixth Amendment to the United States Constitution require no less. [*Id.* at 168.]

The element these cases, and a multitude of other cases,[3] have in common is that the defendant was deprived of the opportunity to assert a potentially meritorious defense because of the acts or omissions of his defense counsel. Where counsel's actions have resulted in the deprivation of a defense and there is no reasonable basis for the actions in trial tactics or strategy, appellate courts, both state and federal, are wont to find effective assistance of counsel.

---

3. For further support of this point in cases where a defendant was deprived of a meritorious defense *see* United States ex rel. Healey v. Cannon, 553 F.2d 1052 (7th Cir.) *cert. denied,* 434 U.S. 874, 98 S. Ct. 221, 54 L. Ed. 2d 153 (1977) (attorney advised client to plead guilty after psychiatric testimony was ruled inadmissible where guilty plea foreclosed appellate review); Johnson v. United States, 413 A.2d 499 (D.C. App. 1980) (defense attorney failed to investigate and pursue evidence that victim of sex offense had not suffered any physical trauma); People v. Nation, 26 Cal. App. 3d 169, 161 Cal. Rptr. 299, 604 P.2d 1051 (1980) (attorney failed to object to identification evidence thereby depriving defendant of a potentially meritorious defense); People v. Brinson, 80 Ill. App. 3d 388, 35 Ill. Dec. 721, 399 N.E.2d 1010 (1980) (defense attorney failed to challenge a weak identification or challenge a confession defendant said was coerced); People v. McDonnell, 91 Mich. App. 458, 283 N.W.2d 773 (1979) (attorney did not seriously investigate or advance an insanity defense for allegedly tactical reasons); People v. Bryant, 77 Mich. App. 108, 258 N.W.2d 162 (1977) (failure to adequately prepare and present insanity defense); Jackson v. Warden, 91 Nev. 430, 537 P.2d 473 (1975) (defense counsel failed to conduct careful investigations and inquiries thereby omitting a crucial defense from the case); Com. v. Bailey, 480 Pa. 329, 390 A.2d 166 (1978)

Although the topic of effective assistance has drawn the attention of courts and commentators throughout the country in recent years, there is a paucity of authority emanating from this Court upon which to draw a constitutionally acceptable standard.[4] *Slater v. Warden,* 241 Md. 668, 673, 217 A.2d 344 (1966), enunciated the test to be whether "under all the circumstances of the particular case ... the petitioner [has] been afforded a genuine and effective representation." That test, still followed today, *State v. Lloyd,* 48 Md. App. 535, 429 A.2d 244 (1981), was based upon the Fourth Circuit cases of *Turner v. State,* 303 F. 507 (4th Cir. 1962) and its sequel *Turner v. State,* 318 F. 852 (4th Cir. 1963). The Fourth Circuit has since reviewed its position and changed its test to conform with the language of reasonable competence referred to in *McMann v. Richardson, supra,* 397 U.S. at 771. *Marzullo v. Maryland, supra.*

Although the Fourth Circuit has found cause to depart from its previous stand, it is apparent that our present test, when properly applied, will withstand constitutional scrutiny. While no longer parroting the language of federal decisions, the test focuses on the acts or omissions of defense counsel rather than the fairness of the proceedings as a whole. As such it is a Sixth Amendment right to counsel standard rather than a due process standard and should still be acceptable.

While we have not addressed a factual situation on all fours with the instant case, the Court's decisions, under the genuine and effective representation formula, tend to parallel similar cases referred to earlier in this opinion. In

(defense attorney failed to pursue defendant's intoxication at time of offense as a line of defense); Ex Parte Duffy, 607 S.W.2d 507 (Tex. Crim. App. 1980) (failure to interview witnesses works a denial of effective assistance of counsel where the consequence is that the only viable defense alternative to the accused is not advanced). In each of these cases a defense that might have otherwise been available to the accused was taken from the factfinder as the result of a conscious or unconscious act on the part of the trial attorney and the reviewing court subsequently found a Sixth Amendment violation.

4. Most issues dealing with effective assistance of counsel have been reviewed by the Court of Special Appeals in recent years pursuant to the Post Conviction Procedure Act.

*Evans v. Warden,* 240 Md. 333, 214 A.2d 144 (1965), where the appellant claimed inadequate representation, this Court remarked that "[t]he specific contention of failure to call [alibi] witnesses, on the face of it, does present a claim on which relief may be granted." *Id.* at 335. The language of *Evans* was implicitly followed in *Davis v. State,* 285 Md. 19, 400 A.2d 406 (1979), where an appellant claimed that his trial counsel had failed to request that an alibi instruction be given to the jury and this Court reversed the Court of Special Appeals and remanded the case to the post conviction court for further inquiry. *Id.* at 37.

Both of these cases involved a situation where the defense attorney, by either act or omission, cut off a possible defense from the accused. Nothing can be more fundamental than that in a criminal prosecution the defendant is entitled to present his defense and that the jury is entitled to hear cogent evidence impacting directly on the guilt or innocence of the accused and Maryland precedent has tacitly so held.

Whenever reviewing the effectiveness of the assistance of counsel on direct appeal, a question arises whether it might not be more proper to allow the question to be heard in a post conviction hearing. Md. Code (1976, 1979 Cum. Supp.), Art. 27, § 645 (a) and Md. Rule BK 40 allow a criminal defendant to collaterally attack his conviction based on, *inter alia,* effectiveness of representation. *See State v. Zimmerman,* 261 Md. 11, 273 A.2d 156 (1971). Our decisions express the view that "appellate courts of this state have recognized that, *ordinarily,* counsel, whose professional ability and integrity are impugned, should be afforded an opportunity to be heard." *Davis v. State, supra,* 285 Md. at 36 (emphasis supplied).

Our decisions, however, have indicated a willingness, at least on some occasions, to address the subject on direct appeal. *See Evans v. State,* 236 Md. 532, 204 A.2d 554 (1964), and *Fowler v. State,* 237 Md. 508, 206 A.2d 802 (1965) (where this Court reviewed the allegation of inadequate representation on direct appeal).[5] In any event, this case rep-

---

5. Reviewing competence of defense counsel on direct appeal is not a novel or unacceptable practice among jurisdictions around the country. *See,*

resents the *extraordinary* situation provided for in *Davis.* Here a defendant is confronted with the specter of public execution for his miscreant behavior. There is, moreover, ample and irrefutable evidence in the record to indicate that no possible trial tactic or strategy could justify the actions of Johnson's defense counsel.

This case is also extraordinary in the number of appellate options, direct and collateral, available to Johnson. If this Court affirms Johnson's conviction but remands for sentencing then a new sentencing proceeding will have to be conducted either before a new jury or the trial court. Johnson will still have the post conviction alternative, whatever the outcome of the sentencing proceeding. If he is denied relief by the post conviction court, he will then be able to appeal the sentence, if life imprisonment, to the Court of Special Appeals or, if death, to this Court. Once his state court alternatives are exhausted he will have available to him the possible relief of a habeas corpus petition in federal court. If the denial of the effectiveness of assistance of counsel is obvious from the record, then to unnecessarily add to this formidable appellate process would be an abhorrent squandering of judicial resources, not to mention the burden it places on the defendant who must endure the anxiety of each step of the procedure.

The second and perhaps more compelling reason to confront this issue now is that to delay it needlessly would be cruel and inhuman. As Justice Brennan noted in his concurring opinion in *Furman v. Georgia,* 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346, *reh. denied,* 409 U.S. 902, 93 S. Ct. 89, 34 L. Ed. 2d 163 (1972), "the prospect of pending execution exacts a frightful toll during the inevitable long

*e.g.,* United States v. Bosch, 584 F.2d 1113 (1st Cir. 1978); United States v. Easter, *supra;* State v. Anonymous, 34 Conn. Supp. 656, 384 A.2d 386 (1978); Tillery v. United States, 419 A.2d 970 (D.C. App. 1980); Johnson v. United States, 413 A.2d 499 (D.C. App. 1980); State v. Douglas, 97 Idaho 878, 555 P.2d 1145 (1976); People v. Neely, 90 Ill. App. 3d 76, 45 Ill. Dec. 428, 412 N.E.2d 1010 (1980); People v. Brinson, 80 Ill. App. 3d 388, 35 Ill. Dec. 721, 399 N.E.2d 1010 (1980); White v. State, 414 N.E.2d 973 (Ind. App. 1981); State v. Moon, Mo. App. , 602 S.W.2d 828 (1980); Com. v. Newmiller, 487 Pa. 410, 409 A.2d 834 (1979); Flores v. State, 576 S.W.2d 632 (Tex. Crim. App. 1978); State v. Jury, 19 Wash. App. 256, 576 P.2d 1302 (1978).

wait between the imposition of sentence and the actual infliction of death. . . .The 'fate of ever-increasing fear and distress' to which the expatriate is subjected can only exist to a greater degree for a person confined in prison awaiting death." *Id.* at 288-89. Subjecting Johnson, who has already been once sentenced to death, to the concomitant anxiety and psychological stress over the time it takes for him to avail himself of his full panoply of rights when the Court could shorten that time by reviewing an obvious violation of the right to counsel is an extra and unjustified burden heaped upon him.

Having examined the applicable legal standard, it is now the propitious point at which to discuss the facts of this case. A review of the facts leads me to the inescapable conclusion that Johnson's defense attorney's representation was constitutionally deficient in at least two respects: (1) calling Johnson to the witness stand to testify in his own defense, and (2) withdrawing the insanity plea prior to the commencement of the case before the jury. These two actions taken by defense counsel will be addressed out of chronological sequence for reasons which, to me, best demonstrate the trial counsel's ineffective representation.

Johnson's initial pleas were not guilty; not guilty by reason of insanity; and not guilty by reason of insanity at the time of the commission of the offense charged but sane now. As a result of his assertion of an insanity defense, Johnson was sent to Clifton T. Perkins Hospital Center for psychiatric evaluation. The report from Perkins indicated that a majority of the doctors who interviewed Johnson felt that he was competent to stand trial and responsible at the time of the offenses. However, one of the four reporting doctors, Dr. J. Clermont, said that he could not "arrive to a definite conclusion about diagnosis and responsibility as the defendant was uncooperative with him during most of the interview." Mr. Kamm, a psychologist on the staff at Perkins who also interviewed Johnson, concluded that Johnson's "contact with reality is difficult to evaluate on account of his poor productivity resulting from extreme negativism." Dr. Clermont also reported that Johnson "admitted that he was

still hearing voices," and that he was "functioning on a borderline level of intelligence."

Initially, Johnson was represented by counsel who moved for a postponement to get another doctor's opinion, moved to suppress a confession Johnson had given to the police, and represented Johnson at a suppression hearing regarding the confession. Johnson does not fault the adequacy of this representation, nor do I. After the suppression hearing Johnson retained new counsel who represented him for the remainder of the trial and at the sentencing proceeding.

At the jury selection stage of the trial the trial judge requested and received questions from Johnson's trial counsel to be addressed to the jurors on *voir dire*. Despite the fact that the State was seeking the death penalty there were no questions regarding the jurors' attitudes about the imposition of the death penalty in the list of questions submitted by defense counsel. At the *voir dire* examination, however, the judge did ask whether the jurors would be able to render an impartial verdict in a death penalty case.

Defense counsel moved for the appointment of another psychiatrist at State expense to assist the defense and for a rehearing on the motion to suppress the confession. Both motions were denied. Defense counsel then withdrew the pleas of not guilty by reason of insanity, ostensibly because the majority report from Perkins declared the defendant competent to stand trial and competent at the time of the offenses. He felt that, in defense counsel's words, "[w]e have no other evidence we *could* present" on the question of competency (emphasis supplied).

After this, defense counsel made his opening statements to the jury. He told them that Johnson would not deny his participation in this "senseless, totally senseless" offense. Rather, counsel directed the jury to focus its attention on the defendant's situation, his school history, intelligence, and family history. Counsel asked the jury to be aware of the drugs the defendant had been taking and their effects on him. Counsel also requested the jury to be mindful of the part Dwayne Mayers played in this offense and the effect he had on the defendant.

The State then began to present its case. The first two witnesses, friends of the victim's, testified regarding the victim's personality and characteristics, laying the foundation for the beginning of the chain of events that led the police to Johnson. The State elicited testimony from these witnesses that the victim was very close to her daughter and that the daughter had recently undergone major surgery. The defense objected to the introduction of the evidence of the daughter's medical condition but made no motion to strike or motion for mistrial after its introduction. No objection was made to the evidence of the victim's relationship with her daughter.

After calling several other witnesses, the State called Detective Jennifer Wehr to the stand. Detective Wehr testified regarding the conditions of the taking of Johnson's confession and read the contents of the statement for the court and the jury. The substance of the statement was that Johnson had been at his cousin's house (Dwayne Mayers') asleep when a friend of his, Amos Batts, came in and told Johnson that he and Mayers had gotten a car. Johnson went to the car, saw the victim in the front seat with Mayers, who was driving, then got in and the three men left with the victim. They drove to a field in Baltimore County where they stopped the car. Detective Wehr, reading Johnson's statement then testified:

> I [Johnson] had sex with the lady first in the car, then Dwayne, then Amos, all in the car . . . . Then me and the girl and Amos got out of the car and. . . [m]e and the girl walked off. . . .I had sex with her again outside. Then we walked off. She had her back turned. I shot once and it hit her in the back. Then again and again. One of them hit her in the head. Then when she fell to her knees I hit her in the front. I went back and got in the car and we drove off.

Detective Wehr also testified that when she asked Johnson if the victim resisted the sexual attacks his answer was

"yeah." This was the State's last witness. Defense counsel made motions for judgments of acquittal which were denied.

The defense's first witness was Ernest Kamm, a psychologist from Perkins Hospital Center who had had the opportunity, as noted, to interview Johnson while he was at Perkins. The State objected to Mr. Kamm's testimony, as defense counsel had already withdrawn the plea of insanity. Defense counsel proffered to the judge that he was not seeking testimony regarding Johnson's mental competence but rather sought to mitigate the charges of first degree murder and other specific intent crimes. Mr. Kamm was then allowed to testify that Johnson functioned at a borderline intellectual level with an I.Q. of 72 and that he was a severely deprived individual with a hostile and negative orientation and a severe authority problem. Defense counsel sought to move Mr. Kamm's entire report into evidence, to which the State objected, and the objection was sustained. In argument before the bench, and out of the hearing of the jury, the State noted that there were "certain things, bizarre thinking" in the report that would pertain to sanity, not premeditation. At the end of Mr. Kamm's testimony the defense called Gordon Glazer. Mr. Glazer failed to respond and the judge recessed the trial until the next day.

On the second day of trial defense counsel called as his first witness the defendant. Counsel asked Johnson why he was living with his aunt and Johnson replied that he had just gotten out of jail for a "burglary charge" and was on probation for that offense. Johnson then related some background regarding his family history, school history, and his relationship with Dwayne Mayers. He testified that he had used a variety of drugs, including PCP. Defense counsel then focused his direct examination on the night before and the day of the offense. Johnson said that Mayers had asked him if he wanted to go out and make some money and Johnson, repeating that he had just gotten out of jail, declined. Johnson then related the events surrounding the offense, saying that while they were driving around with the victim they were smoking parsley flakes treated with PCP.

Just before the victim was killed Johnson told the jury that Mayers told Johnson and Batts that they were going to have to kill the victim. An argument ensued in which Mayers insisted that Batts do the shooting. When Mayers became angry because Batts refused, Johnson said that he volunteered to do the killing. He said he walked the victim into the woods, fired one time, then kept shooting, saying his hand would not stop.

After the State's cross-examination the defense again sought to call Gordon Glazer. Mr. Glazer was, again, not there so the trial judge recessed for lunch. After lunch and on the record the judge related the following:

> I think the record ought to reflect, and I'm not sure that it does at this stage, what has transpired with respect to the witness, Gordon Glazer. He had advised the Court that he had agreed to testify as an expert witness at the request of defense counsel to the effect of certain controlled dangerous substances on persons. Mr. Glazer is an employee of the Center dealing with the problem of abusive substances, and specifically is Head of the New Leaf Center. That center operates under the general supervision of Doctor Pat Hawkins.
>
> Mr. Glazer was here yesterday and everybody apparently assumed, I know I did, that he was going to be back today. When he didn't show up today I sent out a search for him through the Sheriff's Office, when defense counsel informed the Court of their information that he was going to be back at 12:00 o'clock to his center here in Calvert County. Over lunch hour I received a call from Doctor Pat Hawkins who informed me that Mr. Glazer was leaving today on two weeks vacation in Alaska and was supposed to catch a plane to leave on the vacation at about 12:00 o'clock. It was then a little after 12:00 o'clock. She informed the Court that she was attempting to have the plane stopped or him stopped at the plane. I told her I didn't think that

would be necessary. Mr. Glazer did try to stay around yesterday, although he was not here as late as the trial ran.

As soon as counsel returned they were informed about this and in that Doctor Spodak, an independent medical employee of the State of Maryland, was here and had substantially better credentials for testifying in this matter than did Mr. Glazer. Counsel were given the opportunity to interview — defense counsel were given the opportunity to interview Doctor Spodak in the Court's chambers without anybody else being present.

At the conclusion of that interview the Court was requested to state whether or not the Court would limit his cross-examination of Doctor Spodak, if defense counsel called him, and limited their questions simply to the general customary offense of controlled dangerous substance in question on a person. The Court said at that time that it would limit the State's cross-examination to specifically that area. However, it would not prevent the State from recalling Doctor Spodak in rebuttal and on direct examination inquiring of him if he had examined the defendant in this case and if he felt, within his medical, field of medical expertise, that he could express an opinion about what the effect of whatever chemical substances were involved on this defendant. At that point everybody knew that the State was holding Doctor Spodak as a rebuttal witness to the testimony which was expected to be elicited in the defendant's case, and the Court felt that we could not deprive the State of the right to use this rebuttal witness simply because he was now going to testify in a general way as to the effects. All of that having been sifted down and filtered through the various processes that go to make up trial tactics, the defense, as I understand it, has elected to close its case at this point. It is not to call Doctor Spodak.

Defense Counsel: That's correct, Your Honor.

\* \* \*

Prosecutor: Yes, sir. And the other thing is for the record, the Court may have said this and I missed it, that the State will concede he knew about he was a witness although he wasn't officially summonsed for the case. We will state he knew he was a witness in the case, but there is no official summons. That's the State's position on this. Thank you Your Honor.

Unsuccessful in the attempt to obtain any testimony regarding the effects of PCP, the defense sought unavailingly to renew several of its motions and rested its case.

During closing arguments defense counsel emphasized the dominant influence Mayers had in Johnson's life. The gist of the argument was that Johnson lacked the premeditation required for first degree murder; that there was not enough evidence to support the charge of kidnapping; and that there was not enough evidence of force to sustain the charge of rape.

In light of this summary of the evidence, it seems to me that defense counsel's ineffectiveness is glaringly apparent and this Court should address the issue forthwith. It is apparent to me that defense counsel's theory of the case was that the defendant was guilty of the offenses charged, thus, rather than present a defense consistent with a plea of not guilty, his best course of action would be to persuade the jury that the offense Johnson was guilty of was second degree murder and not first degree. This is evident in counsel's opening and closing remarks to the jury, where he admitted the defendant's guilt, and the colloquy at the bench regarding the testimony of Mr. Kamm.

It seems obvious to me that in order to build a defense reducing the offense to second degree murder, defense counsel had to get around both prongs of the State's case for first degree murder. The first prong was the felony murder stat-

ute. Md. Code (1976, 1981 Cum. Supp.), Art. 27, § 410 pro-
vides that a homicide committed during the course of certain
enumerated crimes, including rape, robbery, and
kidnapping, is murder in the first degree. The second prong
is the standard of premeditated murder. Article 27, § 407
provides that "any kind of wilful, deliberate, premeditated
killing shall be murder in the first degree."

Examining the State's case for first degree murder it is
obvious that a defense based on a reduction to second degree
murder was unsupportable. It is also apparent that while a
second degree verdict could arguably (a tenuous argument
at best) have been realizable without Johnson's testimony,
such defense was totally untenable once Johnson took the
stand.

To circumvent the application of the felony murder stat-
ute, Johnson's defense counsel had to raise a reasonable
doubt in the minds of the jurors that Johnson was incapable
of forming the specific intent needed to support the charges
of rape, robbery, and kidnapping. Before Johnson testified,
the defense could have offset the admissions in the
confession with the testimony of Mr. Kamm regarding
Johnson's low intelligence and the impression defense coun-
sel had tried to create, through cross-examination of State
witnesses, that Johnson was under the influence of drugs
and alcohol when the statement was made. After Johnson
took the stand, however, the jury was made aware that
Johnson knew the night before the murder that Mayers was
planning to steal a car; that they were looking to steal some
money; that the victim had her head down and was crying
when Johnson got in the car; that Johnson had an argument
with Mayers before he got in the car about the presence of
the victim; that Johnson had gotten out of jail just a few days
before this offense occurred for a burglary conviction; that
Johnson knew at this point that the victim was there against
her will; that Johnson made a *reasoned* decision just after
the murder to dispose of some of the victim's property
because it was evidence. None of these facts was in evidence
before Johnson took the stand. By calling Johnson to the
witness stand to testify the defense attorney literally drove

home the State's case and made a guilty verdict a foregone conclusion.

It is reasonable to expect that any reasonably competent defense attorney would have gone over a witness' testimony before calling that witness to the stand, particularly where the witness is the defendant. It is, therefore, reasonable to assume that defense counsel knew of Johnson's recent burglary conviction (especially since it first came out in response to a question on direct examination) and that he knew what Johnson's narration of events would reveal. It does not reasonably or even remotely follow that Johnson's testimony that he apparently knew that the car was stolen and that he was making rational decisions before, during, and after the offenses (arguing with Mayers before getting into the car, volunteering to shoot the victim when Batts and Mayers were arguing about who was going to pull the trigger, and disposing of evidence immediately after the murder to avoid detection, respectively) would in any way attenuate the State's case for premeditation. Quite obviously to the contrary, it filled in whatever gaps were left after Detective Wehr's reading of Johnson's confession. By calling Johnson to the stand defense counsel proved that Johnson knew what he was doing before he did it and intended whatever actions he took.

Whatever slender thread defense counsel was resting his case on snapped when counsel called Johnson to the stand. He could not have more effectively ensured a finding of guilty to murder in the first degree if he had been the prosecutor. By having Johnson testify and thereby virtually destroying whatever hope there was for a finding of second degree murder defense counsel blotted out the only defense he had available. It cannot be more obvious that this could not have been the trial strategy of a reasonably competent attorney and, on this basis alone, Johnson was deprived of the effective assistance of counsel.

Not only was Johnson deprived of the effective assistance of counsel before he took the witness stand, he was deprived of it in the incipient stages of the trial when defense counsel

withdrew the insanity plea. Insanity was Johnson's only viable defense from the beginning of the trial.

Where the defendant's plea is not guilty by reason of insanity, one of the eventualities that may arise from the plea is that

> [i]f the verdict on the general plea is guilty and the special verdict on the additional plea is that the accused was insane at the time of the commission of the offense, he has failed in what he sought under his general plea but attained what he sought by his additional plea, in that he shall not be held responsible for his criminal conduct. [*Langworthy v. State,* 284 Md. 588, 593-94, 399 A.2d 578 (1979).]

The result is not an acquittal where the defendant was proved guilty but rather the outcome rests on the legislative determination that because of the defendant's mental incompetence he will not be punished for his act. *Id.* at 598.

It has further been established by this Court that defense counsel is not restricted to the testimony of psychiatrists, or any expert witnesses, to establish insanity. A lay witness may express an impression or conclusion that someone is normal or abnormal provided that he does not testify as to the ultimate legal question of whether the defendant was criminally responsible. *State v. Conn,* 286 Md. 406, 428, 408 A.2d 700 (1979). Whether or not such witnesses were available the record does not reveal since the insanity plea was withdrawn.

There was absolutely no reason for the withdrawal of the insanity plea in this case. The defense could not afford to hire its own psychiatrist to examine the defendant. However, the medical report from Perkins was divided as to whether Johnson was competent to stand trial. Three doctors said he was competent and one doctor said that he could not make the conclusion because of the defendant's poor cooperation. The report said that Johnson admitted hearing voices and that his contact with reality was difficult to evaluate. The author of that report, Dr. Clermont, was

available to the defense at State expense and could have been called as a witness at trial.

Furthermore, defense counsel had Mr. Kamm, a psychologist at Perkins, available to testify on Johnson's behalf. The portion of Mr. Kamm's report that defense counsel was not able to get before the jury because he had withdrawn the insanity plea was to the effect that there were "some signs which point in the direction of bizarre thinking and a tenuous hold on reality," that Johnson had said that he had seen the devil and that he had seen God over water. On cross-examination, when asked if he had an opinion on whether Johnson knew right from wrong, Mr. Kamm said that he had no opinion, implying that there was an insufficient basis to draw any conclusions.

Aside from the potentially favorable expert opinion regarding the defendant's incompetence that was available to defense counsel, there was also an expert, Gordon Glazer, who had been contacted by defense counsel regarding the effects of the drug PCP. Johnson testified that PCP made him hallucinate, "like you might be standing somewhere and you just go out of your —," that it made him forget things, and that he "could smoke about twenty days [jays?] or something like that." PCP is a powerful mind altering drug with potential long term side effects from continued use that an expert could have testified to. Defense counsel, however, did not seek to employ Mr. Glazer's testimony to this end. In fact, Mr. Glazer was not even summonsed to appear.[6]

---

**6.** This failure to summons and secure the appearance of a key witness is further evidence of the ineffectiveness of Johnson's representation. Once the insanity plea was withdrawn the only defense counsel actually pursued was that Johnson was guilty of second degree murder, not first degree. To support that contention the defense called Mr. Kamm to testify to Johnson's borderline intelligence. Mr. Glazer was to testify regarding the effects of PCP. Without this testimony Johnson was left with his account of the incident and evidence of low intelligence to support his claim.

As to Mr. Glazer's availability the trial judge took it upon himself to tell Mr. Glazer's secretary not to try to contact Mr. Glazer, apparently on the belief that the State's rebuttal witness was better qualified to testify on the effects of PCP. Defense counsel did not object. He should have. It was up to defense counsel to decide what witnesses should testify for the defendant, not the trial judge.

Under these circumstances the withdrawal of the insanity plea can in no way be justified as a reasonable trial tactic. It deprived the defendant of his only defense. Even if one were to assume that pursuit of a second degree verdict (which bears a possible sentence of thirty years), was more advantageous to Johnson than the insanity defense, there could have been no evidence adduced during the course of the attending testimony on Johnson's mental competence that would have prejudiced an argument for second degree. Rather, the evidence would have served to bolster the case for a second degree verdict.[7] There is no excuse, therefore, for failing to pursue the insanity plea, thereby depriving the defendant of this defense. *Wood v. Zahradnick, supra.*

Counsel's failure to produce evidence of Johnson's mental competence also deprived the jury of the opportunity to hear arguably vital evidence which should have been weighed in the balance against the evidence of criminal agency. *Wilson v. Cowan, supra.* Indeed, in a case where the death penalty is being sought justice demands that the defendant have the opportunity to present what may be his only defense to the jury. Such a deprivation of a potentially meritorious defense with no reasonable basis in trial tactics is unquestionable proof of ineffective assistance and tantamount to a complete abandonment of the interest of the accused. *People v. Frierson, supra.*

There is one further reason that this Court should, on this record, strike out the verdict. The judicial system has been often, and sometimes stridently, accused of white-washing the problem of inadequate representation by members of the bar. Chief Justice Burger has commented that "we are more casual about qualifying the people we allow to act as advocates in the courtrooms than we are about licensing electricians." Burger, *The Specialized Skill of Advocacy: Are Specialized Training and Certification of Advocates Essential to Our System of Justice?,* 42 Fordham L. Rev. 227, 230

---

7. This is further evidence of ineffective assistance in that it shows that by failing to cull up this available evidence counsel failed to adequately prepare and present the theory of the defense.

(1973). Chief Judge Bazelon of the District of Columbia Circuit Court criticizes the system for going to great lengths to bury the problem of ineffective representation. "One of the major reasons that the problem of ineffective assistance has remained hidden is the appellate court's remarkable propensity to ignore the issue of ineffective assistance altogether and to paper over the cracks in the house that *Gideon* built." Bazelon, *The Defective Assistance of Counsel,* 42 U. Cin. L. Rev. 1, 21, n.3 (1973). Lest we also fall subject to this criticism this Court should meet its responsibility head on. It is squarely presented by the record and resolvable by the evidence it contains.

Based, therefore, on the irrefutable facts in the record that Johnson was deprived of any semblance of a defense when defense counsel withdrew his insanity plea and when he called Johnson to the stand to testify, I would hold, in consonance with the numerous authorities cited earlier, that Johnson was denied his constitutional right to the effective assistance of counsel. I would reverse the judgment of the trial court and remand for a new trial.

Judges Eldridge and Davidson have authorized me to state that they concur in the views here expressed.